INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

---

LIMETREE BAY TERMINALS, LLC,
Claimant and Counterclaim Respondent


against


UNIPEC AMERICA, INC.,
Respondent and Counterclaimant


ICDR Case No. 01-20-0014-7261

---

**FINAL AWARD**

---


James H. Carter, Chairperson
James M. Hosking, Arbitrator
Diana E. Marshall, Arbitrator


**September 14, 2022**

## Table of Contents

I.     THE PARTIES AND COUNSEL ......................................................................... 1

II.    CHOICE OF LAW AND AGREEMENT TO ARBITRATE ........................... 2

III.   PROCEDURAL HISTORY OF THE ARBITRATION ................................... 3

IV.    FACTUAL BACKGROUND ............................................................................ 4

V.     RELEVANT CONTRACT PROVISIONS ..................................................... 10

VI.    THE PARTIES' CONTENTIONS AND REQUESTS FOR RELIEF ............. 16

       A.    LBT's Contentions and Requests ......................................................... 16

       B.    Unipec's Contentions and Requests ..................................................... 16

VII.   ANALYSIS ...................................................................................................... 17

       A.    Governing Standards ............................................................................ 18

             1.   The Parties' Contentions ............................................................ 18

             2.   The Tribunal's Analysis .............................................................. 19

       B.    Unipec's Termination Claim ................................................................ 20

             1.   Tank Foundations ....................................................................... 22

             2.   Other Issues Involving Condition of the Tanks .......................... 24

             3.   Operational Incidents and HSE Procedures ............................... 26

             4.   Conclusions Regarding Unipec's Termination Claim ................ 34

       C.    Designation of Tanks and Movement of Product Between Tanks ....... 34

       D.    Disputed Storage Fee Charges ............................................................ 38

       E.    Costs ..................................................................................................... 48

VIII.  AWARD ........................................................................................................... 49

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

| | |
|---|---|
| LIMETREE BAY TERMINALS, LLC,<br>Claimant and Counterclaim Respondent,<br><br>-against-<br><br>UNIPEC AMERICA, INC.,<br>Respondent and Counterclaimant. | ICDR Case No. 01-20-0014-7261 |

## FINAL AWARD

      WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the dispute resolution provisions of a Terminal Lease Agreement (the "TLA," as amended) dated November 17, 2015 , originally entered into between Freepoint Commodities LLC ("Freepoint") and Unipec America, Inc. ("Unipec") and assigned in 2016 by Freepoint to Limetree Bay Terminals, LLC ("LBT"), and having been duly sworn, having duly heard the proofs and evidence of the parties, do hereby FIND and AWARD, as follows:

## I.    THE PARTIES AND COUNSEL

1.    Claimant LBT is a privately-held limited liability company organized under the laws of the U.S. Virgin Islands, with its principal place of business at 1 Estate Hope, Christiansted, St. Croix, VI 00820. It is the operator of storage terminals for crude oil and petroleum products located at Limetree Bay in the Virgin Islands.

2.    Respondent and Counterclaimant Unipec is a corporation organized under the laws of Delaware, with its principal place of business at 3050 Post Oak Boulevard, Houston, TX 77056. Unipec is a global trading company, trading in crude oil, oil products and other energy commodities.  It is a subsidiary of China International United Petroleum and Chemicals Co., Ltd. ("Sinopec").

3.    The Parties are represented as follows:

Counsel for Claimant:

Mark McNeil, Esq.
Silpa Maruri, Esq.
Dominic Pody, Esq.
QUINN EMANUEL URQUHART & SULLIVAN LLP

51 Madison Avenue, 22nd Floor
New York, NY 10010

       and

Christopher D. Porter, Esq.
QUINN EMANUEL URQUHART & SULLIVAN LLP
711 Louisiana Street, Suite 500
Houston, TX 77002

Counsel for Respondent:

Joseph M. Graham, Jr., Esq.
Kevin O'Gorman, Esq.
Julie N. Searle, Esq.
Geraldine W. Young, Esq.
Denton Nichols, Esq.
Miles Robinson, Esq.
Erin Formby, Esq.
Lily MacDonald, Esq.
NORTON ROSE FULBRIGHT US, LLP
1301 McKinney Street, Suite 5100
Houston, TX 77010

## II.    CHOICE OF LAW AND AGREEMENT TO ARBITRATE

4.    Section 5.9 of Schedule A to the TLA provides:

This Agreement shall be governed by the State of New York [sic] without giving effect to principles of conflicts of law.  Any dispute, controversy or claim arising out of or relating to this Agreement shall be resolved by way of arbitration.  The arbitration shall be conducted in New York, American Arbitration Association (AAA). Any dispute arising out of or in connection with this Agreement which cannot be resolved by negotiation shall be referred to and finally resolved by arbitration in accordance with the rules of the AAA at that time in force, which rules are deemed to be incorporated by reference into this clause and Agreement.

5.    The Parties agreed that this arbitration is to be administered pursuant to the American Arbitration Association's Commercial Arbitration Rules (2013) (the "Rules") and its Large, Complex Commercial Disputes Procedures.

### III.    PROCEDURAL HISTORY OF THE ARBITRATION

6.      LBT commenced this arbitration by filing a Demand for Arbitration dated September 2, 2020.

7.      Unipec did not file an Answering Statement and is deemed to deny all of LBT's claims pursuant to Rule R-5(a). Unipec filed Counterclaims dated October 8, 2020.

8.      LBT filed an Answering Statement to Unipec's Counterclaims dated October 28, 2021.

9.      The Tribunal consists of three Arbitrators and was constituted as follows:

Chair, appointed by the Co-Arbitrators:

James H. Carter, Esq.
Carter Arbitration
860 Fifth Avenue, Apt. 5-B
New York, NY 10065

Co-Arbitrator, appointed by Claimant/Counterclaim Respondent:

James M. Hosking, Esq.
Chaffetz Lindsey LLP
1700 Broadway, 33rd Floor
New York, NY 10019

Co-Arbitrator, appointed by Respondent/Counterclaimant:

Diana E. Marshall, Esq.
Marshall & Associates
2929 Buffalo Speedway, Suite 2307
Houston, TX 77098-1711

10.     A preliminary hearing was conducted by telephonic conference on March 14, 2021, after which Procedural Order No. 1, which is incorporated herein by reference, establishing certain procedures and a schedule for the arbitration, was issued on March 17, 2021.

11.     Unipec filed Amended Counterclaims on April 9, 2021. LBT submitted an Answering Statement to the Amended Counterclaims on April 23, 2021 and a Second Answering Statement to the Amended Counterclaims on December 1, 2021.

12.     The Parties conducted document discovery and depositions and submitted pre-hearing briefs and written witness statements. The Parties also agreed to a Stipulation and Order Concerning Expert Discovery and a Stipulation and Order Concerning Protocol for Electronically Stored Information (ESI), both of which were signed August 9, 2021, and a

Confidentiality and Protective Order, entered December 30, 2021, all of which are incorporated herein by reference.

13.     During the course of the proceedings, the Tribunal issued additional Procedural Orders Nos. 2-6, each of which is incorporated herein by reference. Further telephonic pre-hearing conferences were conducted on December 16, 2021 and March 14, 2022.

14.     Following revisions to the initial schedule, an in-person hearing was conducted in New York, NY, on March 21-25 and March 27-29, 2022. Testimony on behalf of LBT was presented in person by Jeffrey Charles, Keith Neal and Jeffrey Rinker, through the written witness statement of Brian K. Lever and in person by expert witnesses Jeffrey Travis, Cliff Knight and James Landrum.  Testimony on behalf of Unipec was presented in person by James F. Healy, Andrew Conway, Wendy Acaries, Yu Meng, Michael Weaver, Tao Li and Cyril "Ike" Asagwara, through the written witness statement of Qi Li and in person by expert witnesses Sukru Guzey, Mark Baker (by videoconference), Johan Vermeulen and Michael E. Norman.

15.     The Parties submitted post-hearing briefs and reply briefs, together with additional appendices, on May 6 and June 3, 2022, after which the Tribunal concluded that no further materials were required. The hearing was closed, pursuant to Rule R-39(b) of the Rules, on June 10, 2022. The Parties agreed that the final award could be made within 60 days following closing of the record and that it might be signed electronically by that date. (Tr. 3579) The award deadline later was extended by agreement to September 14, 2022.

## IV.     FACTUAL BACKGROUND

16.     LBT is the owner of a crude oil terminal on the Caribbean Island of St. Croix (the "Terminal") that was constructed by Hess Corporation in 1966 in conjunction with a crude oil refinery (the "Limetree Bay Refinery") that Hess, later in a joint venture with Venezuelan oil company PDVSA that was called Hovensa, also operated there.  LBT purchased the Terminal from the estate of its bankrupt prior owner Hovensa and embarked on a substantial refurbishment program in order to bring it back into operation.

17.     A separate company, with which LBT shared certain management members and employees, purchased the Limetree Bay Refinery at about the same time.

18.     Shortly after Hovensa entered bankruptcy, Unipec considered purchasing the facility and conducted a multi-day onsite inspection of the Terminal. Unipec did not purchase the Terminal and instead entered into the TLA with LBT in 2015 (JX0001), to become the "anchor tenant" at the Terminal, agreeing to lease crude oil storage space for a 10-year term.  The TLA was amended once, on December 23, 2016. (JX0003)

19.     Unipec, the trading arm of Sinopec, is one of the largest purchasers of U.S. crude oil in the world. It entered into the TLA at a time when the U.S. lifted a ban on crude oil exports to China. Unipec planned to use this storage capacity in the Western Hemisphere in connection with purchases of crude oil for shipment to China but also in part to be able to take advantage of "contango" market conditions, when the market price of crude oil is lower than the futures price. Such a situation offers a trader with storage capacity the ability to buy and store crude oil on

4

which it can at the same time sell futures at the higher price, eventually delivering the product from storage to the ultimate buyer.

20.     The TLA requires LBT to make available at least 2,000,000 barrels of crude oil storage capacity, permits LBT to supply as much as 10,000,000 barrels of capacity, and requires LBT to perform related services. It requires Unipec to lease up to the full 10,000,000 barrels of capacity if it is made available and pay a monthly fee of $0.41 per barrel, subject to certain agreed rate increases.  So long as LBT makes at least 2,000,000 barrels of capacity available, Unipec must pay for the full capacity made available, up to the limit of 10,000,000 barrels, regardless of the amount of storage capacity Unipec actually uses each month. The storage fees total approximately $50 million per year.

21.     The Terminals today consist of 167 operational aboveground storage tanks with more than 34 million barrels of storage capacity, including 13 million barrels of crude oil capacity and storage capacity for other products. LBT's marine port houses seven active docks and a recently constructed Single Point Mooring ("SPM") system capable of transferring product to and from Very Large Crude Carrier ("VLCC") vessels.

22.     The Terminal was almost half a century old in 2015 and in need of substantial refurbishment. LBT and Unipec accordingly made repair and refurbishment of the Terminal's tanks and other equipment by LBT a condition of their agreement. In 2015 and 2016, LBT invested more than $400 million in capital improvements as part of this effort, which was required as a condition precedent to commencement of Storage Fee charges and was accomplished without objection by Unipec. (*See* CX0134, CX0150) Unipec was assigned 21 specific tanks to provide 10,000,000 barrels of storage capacity.

23.     Refurbishment of the Terminal was completed in 2016. Unipec began using the Terminal in September of that year and proceeded to store substantial quantities of crude oil there, ramping up gradually to nearly 6,000,000 barrels by early 2017. But starting in mid-2017, market conditions changed, and it became less profitable to store crude oil for future sales. Unipec began removing its Product from the Terminal, and by the first half of 2018 it was barely using the Terminal at all.  Unipec then increased its use of the Terminal somewhat, to around 1,400,000 barrels of capacity, in mid-2018 through February 2019, after which Unipec again removed most of its remaining Product.

24.     Market conditions changed dramatically again in about April 2020, largely due to the Covid-19 pandemic, which affected global economic activity adversely and produced "super contango" trading conditions.  Unipec quickly increased use of the Terminal, jumping from storage of fewer than 150,000 barrels in March 2020 to 5,700,000 barrels in June 2020, using 18 tanks. (Neal WS, para. 40; Lever WS, paras. 49-55)  Unipec states that it made a trading profit of approximately $9 million per tank at the Terminal, totaling about $160 million, during this contango period. (Li WS, para. 39)

25.     LBT and Unipec encountered operational difficulties with a number of the deliveries to the Terminal in 2016-2018 involving, as characterized by Unipec, issues such as alleged unexplained variances (both losses and gains) in the volume of Product stored at the Terminal;

inability to measure the volumes stored in each tank accurately; possible contamination of Product; and leaks in pipes due to corrosion. These were the subject of complaints by Unipec to LBT.

26.     Unipec personnel became frustrated with the number of these incidents and with what they considered a lack of customer service they received from LBT, which was a continuing source of friction.

27.     In 2017-2018, Unipec and Sinopec personnel conducted an "HSE audit/review" of the Terminal, including a three-day visit by a five-person team to evaluate "the status of legal compliance, management system and procedures, risk control measures and emergency response capability" of the Terminal. (CX0248) That review was positive in almost all respects but identified four "Opportunities for Improvement." (CX0250) It did not cause Unipec/Sinopec to identify anything as a breach of the TLA.

28.     Operational incidents continued to be a source of friction in 2019-20. The most significant economically of these, and the only one for which Unipec claimed compensation, involved discharge of a cargo from the *MT Parthenon TS* on or about April 17, 2020, in which approximately 22,000 barrels of Unipec crude oil were placed in the wrong tanks, due to human error, and mixed with lower-quality crude there that reduced its value.  LBT and Unipec negotiated a financial settlement by which LBT purchased the Product, which resolved that issue. (Charles WS, paras. 382-83)

29.     In June and again in August 2019, Unipec sent John "Tony" Leech, an "independent auditor and engineer" employed by Oil Inspections (USA) Inc., to "conduct a due diligence inspection of the Terminal, including general operations and individual tanks." (JX0046)  Mr. Leech made a visual inspection of Tanks 7512 and 7513 and observed extensive corrosion.  He recommended "a review of my provisional observations by a qualified API 653 inspector not previously associated with the Terminal." His report to Unipec on his June inspection (JX0032) concluded:

> I have serious concerns about the mechanical integrity, safety and environmental suitability of the tanks, and until further evaluation is performed I am not comfortable that these tanks are fit for service.

> Over the course of a forty plus year career of terminal operations and inspections, I have never encountered a supposedly operational terminal of this scope in such a poor condition.

30.     Mr. Leech was listed initially by Unipec as a proposed witness in this arbitration but was not called and also did not present written testimony.

31.     At the same time as Mr. Leech's initial visit, in June of 2019, LBT advised Unipec that Tank 7513, which was empty at the time, had experienced a collapse of its floating roof, which Mr. Leech attributed in his report to rust damage to a leg supporting it. (JX0032) LBT, which ascribed the collapse to recent heavy rains, took Tank 7513 out of service for repairs and substituted Tank 7515, which had been used previously by Unipec. (JX0030)

32.     Those events caused Unipec to send Mark Baker, an expert in crude oil tank inspection, to inspect Tank 7515, which he determined was fit for continued service (JX0033), and to inspect other assigned tanks to determine their compliance with API (American Petroleum Institute) Standard 653 ("API 653"), which addresses "Tank Inspection, Repair, Alteration, and Reconstruction."  While Mr. Baker noted various issues with a number of the tanks requiring eventual attention, he concluded, based on inspections during three trips he took to St. Croix in the summer and fall of 2019, that there was no deficiency in any of the tanks requiring them to be removed from use. Mr. Baker nevertheless advised that he had observed cracks in the foundations of certain tanks and that the concrete foundation of one of the tanks, number 7403, in particular, displayed cracks at certain points and should be evaluated by a structural engineer prior to using the tank in order to determine its suitability for service and possible repairs. (JX0041)

33.     On October 2, 2019 Unipec sent LBT a "notice of certain issues" at the Terminal, stating that Unipec "would like to work with you to resolve, repair and/or remedy these issues." (JX0046) The letter nevertheless included notice that, because of these "recently discovered areas and aspects of the Terminal operations" that Unipec claimed did not meet TLA standards, Unipec invoked Schedule A, Section 3.5 of the TLA (containing default and cure provisions, quoted below).

34.     That notice cited a large number of issues, the first of which was a need to "Inspect and Conduct Necessary Repairs of Foundation Issues for Tank 7403 and Other Tanks." The issues listed next, in order, were: areas of corrosion and failing paint on tanks; an outside inspector's use of ultrasound (rather than radiography) to inspect certain welds; repairs to a high-level alarm system; implementation of a "formal process" for regular measurements of inventory and variances; removal of standing water and improvement of drainage; and removal of vegetation around tanks and construction debris from a tank dike area. There also were others.

35.     When Unipec advised LBT of these concerns, LBT removed Tank 7403, which had been constructed in 1969, from service and retained a structural engineering firm, Jacobs Engineering, to evaluate it and execute repairs. LBT also wrote to Unipec on October 11, 2019, disagreeing with its invocation of an alleged Event of Default based on these complaints. (JX0047)

36.     LBT also created a separate maintenance program dedicated entirely to addressing Unipec's October 2, 2019 complaints, with a list outlining action items (called "Appendix A") that was updated and provided to Unipec on a regular basis. (Charles WS, para. 372; RX0313)

37.     On October 17, 2019 Unipec wrote to LBT (JX0049) stating that issues Unipec had raised previously remained unresolved and that Unipec would not pay storage charges for "any deficient or nominated tanks, such as Tanks 7403 and 7512, until all of the operational and tank issues are cured or fixed and we are confident that the highest safety, environmental and legal standards are met."

38.     Jacobs Engineering delivered its assessment of Tank 7403, dated October 21, 2019, which started from an assumption that the foundation design of the tank was in compliance with applicable codes at the time of its construction and provides adequate support for the tank.

Jacobs recommended repairs (JX0050), which included pouring structural concrete to reinforce the foundation for the tank.

39.    LBT also advised Unipec on December 13, 2019 that LBT had taken steps to address the issues raised by Unipec's October 2, 2019 notice, had "resolved all of the most central items identified in the letter, and has a clear plan to resolve any other outstanding items." LBT also contested Unipec's right to withhold payment for three tanks based on Unipec's October 17 letter (Tanks 7410, 7403 and 7515) and claimed that about $2.7 million in storage fees were due and owing as of that time. (JX0068)

40.    Unipec responded by letter of December 20, 2019, which reasserted Unipec's claim of a right to withhold fees (now mentioning Tanks 7403, 7410, 7515 and 7512) and reiterated Unipec's previously noticed claims with respect to Terminal and tank issues still not cured or completed. The letter concluded: "As always, Unipec looks forward to working with Limetree Bay to resolve these matters and to bring all leased tanks and the terminal in compliance with our agreement. We look forward to coming to an amicable resolution of all issues with Limetree Bay." (JX0069)

41.    Unipec wrote again on January 17, 2020, reiterating various issues and adding others, referring to them as "notices" and "requests" pursuant to Sections 2.5 and 3.5 of Schedule A of the TLA.  The letter said that "Tank foundations have cracks and deterioration present on many of the tank ring wall foundations, valve containment boxes, and piping supports. … It appears many of the cracks will at minimum require sealing to prevent water intrusion into the concrete. We understand Limetree Bay commissioned a review by a civil engineer for all the tank foundations. Please provide any results that you have not already provided and please provide any updates you may have. Please also provide an updated concrete timeline of all repairs to and projects for the tank foundations." (JX0073)

42.    Meanwhile, Mr. Baker recommended that Unipec's counsel retain Dr. Sukru Guzey, who was an assistant professor at Purdue University and also worked with Mr. Baker's firm, to evaluate Tank 7403 to determine whether its design was in accordance with the relevant codes and standards at the time of construction. He was retained in December 2019 and began his work on the evaluation of the Tank 7403 design in February 2020. His study was based on the as-built drawings for similar Tanks 7512, 7513 and 7516 because design documentation for Tank 7403 was unavailable.

43.    LBT advised that repairs to Tank 7403 were complete in March 2020.  Dr. Guzey concluded that same month, based on information that was available to him, that Tank 7403 was "grossly under-designed" because of an insufficient number of reinforcing rebars in the concrete and that the foundation might "open up and fall," causing the tank to collapse. (Tr. 2168-69) Dr. Guzey advised Unipec that the design issues also "could begin to appear in other tanks that shared the same details." (Guzey Rebuttal Report, para. 10)

44.    Unipec did not disclose Dr. Guzey's analysis to LBT at that time. Although the Parties exchanged additional letters about their disputes throughout 2020, Unipec's summary regarding Tank 7403 in a letter of April 17, 2020 was that Unipec "continued to have reasonable concerns"

based on Mr. Baker's inspection report and would not use or pay storage fees for that tank. (JX0089) Unipec continued to store its Product at the Terminal in other tanks during this time.

45.      In July of 2020, LBT advised Unipec that it was removing Tanks 7516 and 7512, which were filled with Unipec's Product, from Unipec's tank schedule and substituting Tanks 7411 and 7412. Tanks 7516 and 7512 have piping connections to the Limetree Bay Refinery, and LBT had other plans for those tanks. LBT already had begun moving Unipec's Product into the substituted tanks, without prior consultation with Unipec.

46.      Unipec protested this tank substitution and Product movement without its consent, and LBT responded that these actions at the Terminal were within its discretion pursuant to the TLA.

47.      The Limetree Bay Refinery, which is adjacent to the Terminal, had closed in 2012 and been acquired and restarted by an alleged affiliated company of LBT in or about 2015. In February 2021, the refinery experienced an incident in which steam and oil were released into the atmosphere, causing a vapor of crude oil to contaminate surrounding homes. This resulted in national media coverage and governmental actions and private lawsuits that compelled closure of the refinery and led to bankruptcy of its owner and its eventual sale.

48.      On July 13, 2021, Unipec sent LBT a notice of termination of the TLA, invoking provisions of Section 3.5. (CX0011) It cited three alleged independent Events of Default: (a) failure to "operate the Terminal to the highest industry standards, and at a very minimum equal to those of other comparable first-class operators of terminal facilities" pursuant to Schedule A, Section 2.5; (b) failure to "ensure that all Terminal interconnections and facilities such as piping, docks, and related facilities are fully functional and operational for purposes of" the TLA in accordance with Section IX; and (c) a claim that LBT "appears to have become insolvent and otherwise unable to pay its obligations as they become due in the ordinary course." The third ground was based on assertions that LBT was or might be financially responsible for problems with the refinery.

49.      Unipec removed substantially all of its remaining crude oil from the Terminal prior to its July 13 notice of termination and stated therein that it would not bring any additional Product to the Terminal.  Unipec nevertheless has continued to pay LBT storage fees for all tanks other than Tanks 7403, 7410, 7513 and 7515 during the pendency of this arbitration.

50.      On July 16, 2021, Unipec wrote to LBT advising that Unipec was withdrawing its request in this arbitration for an order for specific performance of LBT's obligations under the TLA and instead would seek a determination in an award of Unipec's right to terminate the TLA, the effective date of which would not be set until after this Tribunal's ruling.  (JX0130)

51.      Ease of travel to St. Croix was disrupted by Covid-19 in 2020-21; but in October 2021 a team of experts retained on Unipec's behalf, including Mr. Baker, and Unipec counsel visited the Terminal. Mr. Baker took a number of pictures of tanks, which he shared with Dr. Guzey. They concluded that Dr. Guzey should extend his analysis to other tanks at the Terminal, which he determined had been constructed from similar designs.  Dr. Guzey concluded that, because of that similarity, the foundations of all of the series 7400 and 7500 tanks were "under-designed in

Day 1" when constructed. (Tr. 2173-74) He recommended that they all be removed from service or, alternatively, be filled to only one-half of their capacity, in order to avoid risk that a tank or tanks might collapse.

52.     This analysis was first disclosed to LBT when Dr. Guzey's expert report was submitted in this arbitration, together with those of other Unipec experts, on December 3, 2021. LBT protested that the reports sought to raise, on an untimely basis and without any opportunity to cure, almost 200 additional issues involving the condition of the Terminal.  Following an exchange of correspondence, the Tribunal entered Procedural Order No. 3, which is incorporated herein by reference, addressing the interim treatment of these additional allegations.

53.     On December 22, 2021 Unipec supplemented its July 13 notice of termination by incorporating the expert reports of four witnesses, including that of Dr. Guzey, which the letter claimed identified "197 discrete problems with the Terminal and LBT's failures to perform under the TLA." (RX0494)

## V.     RELEVANT CONTRACT PROVISIONS

54.     The primary text of the TLA (in which LBT's predecessor Freepoint, rather than the later assignee LBT, is identified as the provider of Services) is seven and one-half pages long, and the document also includes Schedules A through F.  It was amended by a First Amendment dated December 23, 2016. Some of the TLA's relevant terms, as amended, are the following:

55.     Section II. **Terminal**. Freepoint will provide the Services (as defined herein) described in this Agreement at the terminal located at No. 1 Estate Hope, Christiansted, St. Croix 00820, U.S. Virgin Islands (the "**Terminal**"), with the specifications and other information concerning the Terminal, including, but not limited to, a map detailing the layout of the Terminal and its facilities, themselves, a dock information sheet and a port-book providing further information about the Terminal being set forth in Schedule "F"—Terminal Technical Description, as the same may be updated from time to time and notified to the Customer.  Customer will have the exclusive right to utilize up to ten million (10,000,000) barrels of Tankage set forth on Schedule "F" hereunder, and unencumbered and priority access to the Terminal in accordance with this Agreement.  The Tanks to be used by Customer shall be determined by Freepoint and notified to Customer.

56.     Article III. **Product**. Freepoint will store and handle the following petroleum products for Customer: Crude Oil (the "**Product**", as further defined under Schedule "A").

    A.  **Storage Capacity**.  Subject to the availability of Tankage and Terminal facilities to provide the Services, Customer shall lease up to ten (10) million barrels of storage capacity calculated on the basis of shell capacity; provided, (a) Customer shall lease no less than two million (2,000,000) barrels of working capacity capable of receiving Product from a partially loaded VLCC as of the Commencement Date, and a fully-loaded VLCC as soon as commercially reasonable; and (b) provided further, however, that Customer shall not be under any obligation to lease any tankage whatsoever unless and until (1) Freepoint shall have refurbished and modified a

number of Tanks at the Terminal and such refurbished and modified Tanks have a minimum shell capacity of two million (2,000,000) barrels no later than the Commencement Date, and (2) Freepoint shall have otherwise met all conditions precedent to the Commencement Date of this Agreement specified in <u>Section X</u>, below.  For the sake of further clarity, Customer shall only be required to lease up to ten (10) million barrels of available storage capacity for its exclusive use under the terms of this Agreement if, in fact, such capacity is made available to Customer by Freepoint pursuant to the terms and conditions of this Agreement.  Such capacity shall be made available on an incremental basis upon prior notice to Customer and Customer shall confirm receipt of such notice and, when made available, the Services and Customer's rights and obligations under this Agreement shall commence. . . . The tanks ("**Tanks**") being leased to Customer are described in Schedule F attached hereto by tank number, capacity, initial Product, and location in the table below, as such table is amended from time-to-time by the Parties to reflect Tanks leased to Customer.

57.     Section V.  **Storage Fees; Heating Charges; Additional Charges and Fees**.  In consideration for the Services to be provided by Freepoint to Customer hereunder, Customer will pay Freepoint (i) storage fees accruing at a monthly storage rate (the "**Storage Rate**") per barrel of shell capacity made available and confirmed by Customer, (the "**Storage Fees**") as set forth

below. . . In no event will Customer incur or be charged any fees or charges, howsoever described, during any period when any Tank(s) are being examined, repaired, or otherwise placed out of service by Freepoint, or otherwise use of the Tanks(s) has ceased other than where use has ceased due to actions of the Customer.

58.     Section IV.  In the event that Tanks are temporarily unavailable for any reason, including but not limited to inaccessibility, Freepoint will adjust charges (e.g. Storage Fees) hereunder to obligate Customer for only that part of the Terminal or Tankage that is available to Customer for receipt, storage, and delivery of the Product in accordance with this Agreement; provided, however, that the Customer may terminate this Agreement if the capacity of storage for which full Services can be provided falls below two million (2,000,000) barrels of shell capacity on a non-temporary basis, excepting where such condition is a result of an event of Force Majeure. Should Customer so elect to terminate this Agreement, then, in such event, the Parties will wind-up affairs between them and discharge accrued liabilities to one another through the effective date of such termination and otherwise provide for the transfer of Customer's Product in storage and an orderly transition of the business relationship.

59.     Section V.  **Storage Fees; Heating Charges; Additional Charges and Fees**. In consideration for the Services to be provided by Freepoint to Customer hereunder, Customer will pay Freepoint (i) storage fees accruing at a monthly storage rate (the "**Storage Rate**") per barrel of shell capacity made available and confirmed by Customer (the "**Storage Fees**") as set forth below . . .

In no event will Customer incur or be charged any fees or charges, howsoever described, during any period when any Tank(s) are being examined, repaired, or otherwise placed out of service by Freepoint, or otherwise use of the Tank(s) has ceased other than where use has ceased due to actions of the Customer.

60.     Section VI. **Services**.  Freepoint will operate the Terminal in a safe and professional manner, and in accordance with generally accepted practices for the operation of storage facilities of a size and type comparable to the Terminal.  Freepoint shall provide the following services to Customer during the Term (the "**Services**"):

  A.  Provide a safe port, safe berth, or anchorage for all Vessels, including partially loaded VLCC's as of the Commencement Date, and fully loaded VLCC's at an offshore floating single mooring point or system capable of accommodating a VLCC when built, subject to those operational constraints provided for in this Agreement and by Law;

  B.  Provide Customer priority access to its Tankage and to Terminal facilities required for the first in-time, before all others, priority use of Customer to utilize the Tankage as contemplated hereunder, twenty-four hours per day, seven days per week, to the extent doing so does not prejudice other customers already at the Terminal or who have a confirmed berth;

  C.   Receive Product into Tanks;

  D.  Store, maintain, and handle Product (see Heating Charges, below);

  E.  Provide through-put services for Product;

  F.  Transfer or load Product onto or from Vessels per Customer's direction, at rates that comply with Customer's requirements and directions and Vessel Capabilities (i.e. Terminal shall have the ability to load one million barrels in no greater than 36 hours and five hundred thousand barrels in no greater than thirty (30) hours. Unload rates are determined by the vessel as opposed to the terminal. Information on the delineation of facilities between terminal and refinery will be provided following transfer of ownership of the Terminal to Freepoint;

  G.  Gauge and measure quantity of Customer's Product;

  H.  Inventory (including gain/loss), Product movement, and similar reporting in accordance with Customer's reasonable request and customary practice; and

  I.  Any other ancillary services as may be required to facilitate use of the Tanks, including services for which additional fees and charges may apply (see Section VII below).

61.     Section IX. Tank Refurbishment/Modification.  Freepoint shall, at its sole cost and expense, perform any necessary refurbishment and/or modifications to the Tanks that are necessary to enable Freepoint to provide the Services pursuant to this Agreement, including performing, at Freepoint's sole cost and expense, those refurbishments and modifications to the

Tanks specified in Schedule "D" to this Agreement and, at a minimum, compliant with the standards specified by AOR 653 certification, applicable Law and any applicable requirements of Title V of the Clean Air Act (as administered by the U.S. Environmental Protection Agency), and shall also ensure that all Terminal interconnections and facilities such as piping, docks, and related facilities are fully functional and operational for purposes of this Agreement.  Freepoint shall consult with Customer with respect to any refurbishments and/or modifications to the Tanks. Any other refurbishments or modifications to the Tanks required by Customer are to be carried out to the standards specified by, and at the sole cost of, Customer. . . . Freepoint will identify to Customer those contractors or other service providers who are responsible for the refurbishment and modification of the Tanks, and shall provide Customer with any written confirmation received from such contractor or service provider confirming completion of the modifications and refurbishment.  Notwithstanding the foregoing, Customer shall have the right to examine such certifications, review documents, and make further inquiries to Freepoint regarding such contractors and other service providers with respect thereto.

62.    Section X. **Conditions Precedent to Commencement Date and Extension Terms**. The Commencement Date and the effectiveness of the Customer's obligations under this Agreement shall commence upon satisfaction of all of the following conditions . . .

C.  All repairs, refurbishments, modifications, and improvements to the Terminal and supporting and appurtenant facilities shall be both completed and be in compliance with the standards specified in Exhibit "D". Freepoint will identify to Customer those contractors or other service providers who are responsible for the repairs, refurbishments, modifications, and improvements described herein. …

63.    Section XI. **Conditions Precedent to Lease Up to Ten Million (10,000,000) Barrels of Capacity**. Customer shall be required to lease each additional increment of available Tank capacity up to ten million (10,000,000) barrels of storage capacity only when: …

B.  All repairs, refurbishments, modifications and improvements to the Terminal and supporting and appurtenant facilities necessary to perform the Services, shall be both completed and in compliance with the standards specified in this Agreement.

64.    Schedule A to the TLA is titled "**General Terms and Conditions**." It includes a definition in section 1.14 of "Tankage or Tank" to mean "the tankage identified on Schedule "F" hereto and selected by Freepoint and notified to Customer in accordance with this Agreement."

65.    Schedule A also includes Section 2.5, which states:

Terminal Operations. Control and operation of the Terminal will rest exclusively with Freepoint, and Freepoint shall be in charge of and operate the Terminal to the highest industry standards, and at a very minimum equal to those of other comparable first-class operators of terminal facilities. …

66.    Section 3.4 of Schedule A, titled "Invoicing and Payment," includes the following:

13

… Customer will be assessed a late charge of one and one half percent (1.5%) interest per month (or the highest rate permitted by Law, whichever is less). Customer may withhold from any payment amounts disputed by Customer in good faith without any interest penalty pending resolution of the dispute, and, upon resolution of the dispute (which will be diligently pursued by the Parties) no interest will be paid on any amount deemed owed [by] either Party. …

67.     Section 3.5 of Schedule A, titled "Default," provides:

A default will have occurred under this Agreement with respect to a Party if: (a) such Party fails to pay any amount due under this Agreement, and such failure to pay continues for five (5) Business Days following written notice from the other Party; (b) a material breach of a representation or warranty made by such Party herein; (c) such Party fails to perform any material covenant or obligation hereunder and such Party fails to cure such failure within thirty (30) days of a written notice from the other Party; provided, however, that in the event such default is not reasonably capable of being cured within such thirty-day period and the party in default is diligently pursuing a cure, then the cure period shall be extended for a supplemental thirty (30) days; …

If Freepoint fails to comply with its material obligations under this Agreement or the Terminal's operations manual or procedures, Customer shall notify Freepoint in writing of such failure, and Freepoint shall cure the situation in accordance with Section 3.5(c). If Freepoint fails to cure such breach, it shall be deemed an Event of Default pursuant to this Agreement.

Operator will diligently proceed with the installation of upgraded pumps, piping, vales and fittings so as to ensure that the Terminal is capable of, and can, in fact and in actual operation, pump Product from the Tanks provided by Operator to Customer pursuant to Subsection E of Section X and used by Customer at the Loading Rate, and the failure of the Terminal to install these pumps, piping, valves and fittings shall be deemed an Event of Default of Operator. …

Upon an Event of Default with respect to a Party, the non-defaulting party may immediately terminate this Agreement upon notice to the defaulting Party. …

68.     Section 4.2 of Schedule A provides:

Limitation of Liability. Title to Product will not pass to Freepoint, and Freepoint will not be liable as an insurer of Product.  Freepoint will be liable to Customer for damaged, lost, or destroyed Product to the extent such was caused by the gross negligence and/or willful misconduct of Freepoint in the storage and handling of the Product.

Notwithstanding anything to the contrary in this Agreement, Operator shall be liable to Customer for any loss between the quantity of Product Customer delivers to the Terminal, and the quantity of Product Customer loads onto a Vessel from the Terminal, for any loss greater than 0.25% as measured in accordance with the standards and

14

procedures specified in this Agreement. Product gains and losses shall be tracked monthly and aggregated on an annual calendar year basis, …

In the event that a loss for the loading or discharge of any Vessel is calculated and/or determined to be greater than or equal to 0.15%, the Operations Committee will promptly meet and review the information associated with such loss, and work on a proactive basis to resolve the cause of the loss, and to recommend technical and/or operational changes, and/or additions of new equipment (e.g. meters) or repairs or replacement of existing equipment, for Operator to implement, as necessary to prevent further losses of greater than or equal to 0.15%. …

Freepoint will not be liable to Customer for chemical deterioration or evaporation of Product caused by storage of Product, at the instruction of Customer and during normal handling operations at the Terminal, for a time and in a manner that causes a natural deterioration in the quality of the Product or evaporation of the Product, or any downgrade and/or re-designation of Product occurring as a result of dissimilar Products interfacing with each other; provided however nothing herein shall release Freepoint from the obligation to act as a prudent and reasonable operator.

69.     Section 4.3, Indemnification, states (in bold-face italics): …

     ***C. Neither Party shall be liable to the other for any consequential, indirect, incidental, punitive, exemplary, special, or similar damages, including, but not limited to, any for loss of profit, loss of business opportunity, or other business interruption damages.***

70.     The TLA's Schedule D, headed Tank Refurbishment/Modification, provides:

     Freepoint shall be responsible, subject to Schedules A and C, at its sole cost and expense, for the following modifications of the Terminal.  Customer and/or Customer's Affiliate Sinomart International LTD shall have the right to engage an independent third party inspector to review with Freepoint the Tank and all other Terminal modifications and approve such Tank and Terminal modifications (if Freepoint believes approval is warranted).

     1.   Piping to connect the Tanks to the berth to be used by Customer.  A blending manifold connecting relevant Tanks.

     2.   …

     3.   Tank refurbishment and modifications to the Terminal (other than Item #1 above) necessary to provide the Services for 2,000,000 barrels shall be completed and placed into service no later than the Commencement Date.

     4.   Standards for tank refurbishment and modifications: All work performed shall be in accordance, and in compliance, with all Law; and where Law is not governing, with the applicable API and/or ASTM procedures and recommendations, and where the API or ASTM is not governing, then with best industry practices.

5. Accurate measurement.

## VI.   THE PARTIES' CONTENTIONS AND REQUESTS FOR RELIEF

### A.   LBT's Contentions and Requests

71.    LBT contends, first, that Unipec has failed to pay rental charges for Tanks 7403, 7410, 7513 and 7515 for certain periods of time and that LBT has suffered damages as a result.

72.    LBT further maintains that the TLA gives LBT the unilateral right to select the tanks in which Unipec's crude is stored and to move Unipec's crude between tanks that LBT has selected.

73.    LBT denies each of Unipec's counterclaims and contends in particular that Unipec has no proper basis to terminate the TLA because (a) LBT has not committed any breaches that, individually or collectively, are material; (b) alternatively, assuming material breach, the election of remedies doctrine and/or the principle of estoppel bar the asserted termination; and (c) Unipec cannot terminate on the basis of issues for which Unipec allegedly failed to provide timely notice and opportunity to cure.

74.    LBT claims damages in the amount of $41,887,627.48, which include tank rental charges, other amounts withheld by Unipec and also claims for costs, fees and interest in the arbitration. Among these are attorneys' fees of $9,175,779.95 and expert fees of $1,647,960.37. (LBT Post-Hearing Reply Br., para. 510; Supplemental Costs App., para. 3)

75.    LBT seeks declarations that (a) under the TLA, LBT has the exclusive, unilateral right to select the tanks used by Unipec, and that LBT may unilaterally move Unipec product into and among the tanks it selects, and (b) that Section IX and Schedule D standards, not "highest industry standards," govern tank maintenance and modifications under the TLA.

### B.   Unipec's Contentions and Requests

76.    Unipec denies all of LBT's claims for damages with respect to tank rental fees for tanks 7403, 7410, 7513 and 7515 and/or, in the alternative, contends in post-hearing briefing that any damages should be reduced in various amounts as discussed below. Unipec maintains that each of these four tanks (a) was unusable, unsafe and thus unavailable for use during the periods for which Unipec has withheld storage fees and does not meet the TLA's applicable tank standards; (b) was being examined or repaired but was never reliably verified to be repaired; and/or (c) had not yet been confirmed by Unipec in the case of Tanks 7513 and 7515.

77.    Unipec contends that the TLA requires prior notice and Unipec's agreement on identity of the tanks in which its crude oil will be stored and bars LBT from moving Unipec's Product between tanks without Unipec's prior agreement.

78.    Unipec contends that it is entitled to terminate the TLA because of LBT's material breaches, which Unipec argues are cumulative and continuing, including (a) failure to repair the foundations of the 7400 and 7500 series tanks and (b) failure to conduct operations and maintain health, safety and environmental ("HSE") practices that meet the required standards of the TLA.

16

79.     Unipec requests dismissal of all of LBT's claims and seeks declarations that LBT has failed to comply with its material obligations under the TLA, that Unipec notified LBT in writing of each such failure; that LBT has failed to cure such failures or breaches in accordance with Section 3.5 of Schedule A of the TLA; and that such breaches shall be deemed an Event or Events of Default under the TLA that permit Unipec to immediately terminate the TLA upon notice to LBT without liability other than as provided in the last paragraph of Section 3.5 of Schedule A. (Amended Counterclaims, Prayer for Relief)

80.     Unipec requests, "at a minimum and in the alternative" to such a declaration, a declaration that the 7400 and 7500 series tanks at the Terminal are unsafe for use and Unipec is not obligated under the TLA to lease and incur storage fees for any tanks in those series of tanks. (Post-Hearing Reply Br., para. 245)

81.     Unipec also requests declarations that (a) under the TLA, Terminal Operations include Terminal and Tank maintenance and that all Terminal Operations and Tank maintenance are subject to, and must meet under the TLA, the "highest industry standards," which includes "at a very minimum [standards] equal to those of other comparable first-class operators of terminal facilities"; (b) LBT must provide prior notice of the Tanks to be used and made available to Unipec, and Unipec  has the contractual right to confirm a Tank before paying Storage Fees for the Tank; (c) LBT cannot unilaterally move Unipec's Product without prior notice to and consent from Unipec, as well as a permanent injunction prohibiting LBT from unilaterally moving Unipec's Product without prior notice to and consent from Unipec; and (d) Unipec has not breached the TLA and is not required to pay for Tanks 7403, 7410 and 7515.  (Amended Counterclaims, Request for Relief)

82.     Unipec requested in its Amended Counterclaims (p. 49), as an alternative to an award immediately terminating the TLA or declaring that Unipec has the right to immediately terminate it, an interim award or order requiring specific performance by LBT of "each specific act requested and shown" by Unipec in the arbitration to be a violation of the TLA.  Unipec later withdrew this request for an award or order of specific performance.

83.     Although Unipec's Amended Counterclaims requested an award of "all recoverable damages resulting from LBT's breaches" of the TLA, Unipec has not asserted any specific claim for damages in its post-hearing submissions.

84.     Unipec seeks an award of attorneys' fees, expert fees and costs in the amount of $6,269,530.26.

## VII.   ANALYSIS

85.     The undersigned Arbitrators have carefully considered all of the submissions and evidence presented by the Parties in this proceeding, although not every particular argument, filing or exhibit is mentioned in this Award.

86.     Unipec's counterclaim seeking termination of the TLA received the majority of attention during the arbitration and therefore will be considered first.

### A.    Governing Standards

87.    An initial issue, relevant to both Unipec's termination claim and the Parties' requests for declarations, is what standards govern LBT's operation of the Terminal and maintenance of its tanks and equipment.  Both Parties maintain that the TLA is unambiguous and should be interpreted based on its plain language defining those standards, and the Tribunal denied discovery of its negotiating history on that basis in Procedural Order No. 4. Although the Parties offered certain extrinsic evidence regarding drafting history at and after the hearing, to be considered if the Tribunal found ambiguity, it is not necessary to consider those materials.

### 1.    The Parties' Contentions

88.    Unipec contends that Schedule A, Section 2.5 ("Terminal Operations") provides the basic standard for all terminal operations, including tank maintenance, which is that LBT shall "operate the Terminal to the highest industry standards, and at a very minimum equal to those of other comparable first-class operators of terminal facilities."  Unipec also relies on (a) Section VI of the TLA ("Services"), which states that Freepoint (now LBT) "will operate the Terminal in a safe and professional manner, and in accordance with generally accepted practices for the operation of storage facilities of a size and type comparable to the Terminal," and (b) Section 4 of Schedule D ("Tank Refurbishment/Modifications"), which provides that "All work performed shall be in accordance, and in compliance, with all Law; and where Law is not governing, with the applicable API and/or ASTM procedures and recommendations, and where the API or ASTM is not governing, then with best industry practices."

89.    Unipec's position is that "highest industry standards" is the applicable test for the Tribunal to apply, that it is in addition to a second requirement that all standards be "equal to those of other comparable first-class operators of terminal facilities," or, in the alternative, that the required standard is the second of those formulations, a "very minimum" of equality with "other comparable first-class operators of terminal facilities."

90.    LBT maintains that the TLA contains a three-tiered structure that separately addresses standards applicable to (a) tank maintenance and maintenance of other non-tank equipment and operation of the Terminal (Schedule D, Section 4: API or ASTM procedures and recommendations or, if none applicable "best industry practices"); (b) non-tank equipment such as piping, docks and related facilities (Section IX: "fully functional and operational"); and (c) operational matters at the Terminal (Section VI and Schedule A, Section 2.5: "at a very minimum equal to those of other comparable first-class terminal facilities").  With respect to the tanks, LBT thus argues that satisfaction of API/ASTM procedures and recommendations is the governing standard and should be considered to be at least equivalent to "best industry practices."

91.    LBT also notes the presence of more specific provisions of the TLA that relate to how losses of Product are to be treated (Section 4.2 of Schedule A, as amended) and the selection of tanks to be used for storing Unipec's Product (Section II), which LBT argues govern those matters.

18

2.      **The Tribunal's Analysis**

92.     While "operations" and "maintenance" are distinct concepts in some contexts, as LBT
contends, the references to performance standards woven through various parts of the TLA do
not treat them as separate for all purposes and instead treat "operations" as an overarching
category of performance. "Terminal Operations" are governed by part of Schedule A, the TLA's
"General Terms and Conditions," while Schedule D's Section 4 is limited in scope to "standards
for tank refurbishment and modifications." Further, Schedule D, on which LBT relies, is
explicitly "subject to Schedules A and C" of the TLA. It is therefore not possible to atomize the
standards as LBT suggests.

93.     However, accepting that Section 2.5 of Schedule A provides a basic standard applicable
to all Operations still leaves unresolved the question of what the reference to "highest industry
standards" actually means.  No witness was able to point to any authoritative industry document
that uses or defines that term, and it was not shown to be part of customary industry usage. (Tr.
3370, 3390 (Norman); Norman Dep. Tr. 39, 204; Tr. 3071 (Baker); Baker Dep. Tr. 204)

94.     Unipec fact witnesses interpreted that standard subjectively or in rather sweeping terms,
claiming it to include, for example, "be proactive, and not reactive, in identifying operational and
other terminal issues and deficiencies;" "no visible corrosion;" "take seriously all HSSE-related
incidents, including near misses;" "actively participate in voluntary high-performance industry
groups;" and "take the customer's concerns seriously." (*E.g.*, Healey, Acaries and Asagwara WS,
summarized in Unipec Post-Hearing Br., para. 334)

95.     Unipec's experts also admitted that "highest industry standards" is not a term used with a
concrete meaning in the petroleum terminal industry and instead treated it as an umbrella under
which to place any form of record keeping, or any choice of equipment, that a particular expert
might consider required for the "highest" or most nearly perfect type of operation. (*E.g.*, Tr.
2985, 3071-72 (Baker))

96.     Unipec attempted to cure this omission of evidence about the source of "highest industry
standards" at and after the conclusion of the hearing by submitting a list of supposedly objective
standards, based almost entirely on testimony of its own fact witnesses; but they came as a post-
trial afterthought, and some conflicted with specific provisions of the TLA, such as those
governing acceptable levels of Product loss during normal operations.

97.     "Highest industry standards" thus appears to be largely an aspirational concept,
particularly where it is contrasted in the same sentence of the TLA with a "very minimum"
standard for those same operations, a "safe harbor" standard that could be measured by objective
criteria based on the operations of comparable facilities.  An agreement like the TLA may
contain simultaneously "a goal that parties hoped to attain" while at the same time providing
lower minimum standards that set the benchmark for satisfaction of contractual obligations. *See
Lovink v. Guilford Mills, Inc.*, 878 F.2d 584, 587 (2d Cir. 1989). While the Second Circuit
decision in *Lovink* may, as Unipec notes, have involved a contract governed by North Carolina
law, there is no reason to suggest that New York law would demand any different result.

19

98.     On the contrary, balancing the two elements in the first sentence of Section 2.5 is a commonsense interpretation that renders neither element superfluous, respects the use of the term "shall" that applies to the standard as a whole, and is also consistent with the other specifications found elsewhere in the TLA.  In other words, in operating the Terminal, LBT must aspire to highest industry standards, but at no time may its performance drop below that of other comparable first-class operators.

99.     The Tribunal concludes that terminal operations, including maintenance of tanks and movement of Product to and from the tanks, are to be, "at a very minimum," at a standard "equal to those of other comparable first-class operators of terminal facilities." This is compatible with Section VI's reference to generally accepted practices at comparable terminals and Schedule D's separate requirement that tanks be maintained pursuant to published API requirements or other, more general "best industry practices."

100.    Unipec therefore is not entitled to declarations in the form it seeks with respect to governing standards for terminal operations in para. 81(a) above. Nor is LBT entitled to the declaration in the form it seeks in para. 75(b) above. Instead, the standard prescribed in the TLA for all terminal operations, including tank maintenance, is that the Operator will aspire to meet the "highest industry standards" but "at a very minimum" must comply with standards "equal to those of other comparable first-class operators of terminal facilities."

### B.     Unipec's Termination Claim

101.    As the basis for its termination claim, Unipec invokes Section 3.5 of Schedule A, which provides that, "Upon an Event of Default with respect to a Party, the non-defaulting party may immediately terminate this Agreement upon notice to the defaulting Party."  An "Event of Default" is defined to include a situation in which a Party "fails to perform any material covenant or obligation hereunder" and the failure is not cured within 30 days of written notice or, in an appropriate case, an extended cure period of an additional 30 days.

102.    Unipec claims that it gave effective notice of Events of Default on October 2, 2019 and July 13, 2021 (supplemented in each case with follow-on notices that amplified them), and that LBT failed to provide adequate cure within the specified time limits.  Unipec seeks a declaration that it now is entitled to terminate the TLA. In its pre-hearing brief (para. 1), Unipec alleged that LBT committed an Event of Default by failing to perform "the basic purpose of the parties' agreement: to allow [Unipec] to bring its crude in the terminal and receive the same quality and quantity in return." In its opening Post-Hearing Brief (paras. 357-58), Unipec restated that "basic purpose" of the TLA as "to allow Customer [Unipec] to receive all of the Services provided under the TLA."

103.    The Tribunal concludes that Unipec's initial formulation of its claims is the better of these, describing the basic purpose of the TLA as allowing Unipec to bring its Product to the Terminal, store the Product safely there, upon payment of defined fees, and receive back the same quality and quantity of crude oil.

104.     An Event of Default is defined to require a "failure to perform" a "material" obligation imposed on a Party by the TLA. Unipec's argument is that any failure to satisfy a material obligation, if not cured after proper notice, becomes an Event of Default. But this is not correct, because contractual obligations such as those involved here cannot be defined as perfection in delivering all of the Services. Under either of Unipec's formulations of its claims, they raise the issue of degree of alleged failure to perform in satisfaction of what are broadly and generally described obligations. This requires identifying not only the materiality of the obligation, but also the extent—and therefore the materiality--of any failure or series of failures to perform. Put another way, an "obligation" to act in accordance with a general standard becomes "material" only at a level where a violation would cause potentially serious consequences.

105.     New York law requires that a breach of a contract such as the TLA must be material in order to justify termination of an agreement, which is an "extraordinary remedy" available only when a breach goes to "the root of the agreement." *Septembertide Publishing, V.B. v. Stein & Day, Inc.,* 884 F.2d 675, 678 (2d Cir. 1989). A series of breaches, even if cumulative, also must go "to the root of the agreement between the parties and [be] so substantial that it defeats the object of the parties in making the contract." *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp.2d 383, 414 (S.D.N.Y. 2004) (cleaned up), (quoting *Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)).

106.     Although the agreement in issue did not involve New York law, the Fifth Circuit considered an attempt to terminate a 10-year contract for provision of petroleum storage services similar to the TLA in *Publicker Chemical Corp. v. Belcher Oil Corp.*, 792 F.2d 482 (5th Cir. 1986). The court addressed an argument like Unipec's, that any instance of a violation of a prescribed conduct standard could justify termination, as follows:

> It would be remarkable if the parties actually intended such a rule to govern a complex, long-term commercial relationship, between sophisticated parties, involving millions of dollars. Minor mishaps and disagreement affecting contract rights are inevitable in the course of any such relationship. A rule permitting either party to threaten termination of the entire relationship on the basis of any one of these minor incidents will encourage such threats whenever one party finds that the contract is no longer economically advantageous. Prudent businesses ordinarily avoid the risk and uncertainty of such drastic arrangements.  If the parties truly had intended to be governed by such a rule, they would have memorialized this intent. … 792 F.2d at 486.

107.     The requirement of a material breach also applies to claims that a series of incidents may have a "cumulative effect" that "defeats the object of the parties in making the contract." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 187 (2d Cir. 2007) (quoting *Frank Felix Assocs. v. Austin Drugs, Inc., supra*). Unipec's termination claim must be tested against this standard of materiality.

108.     Unipec's termination claim is based on (1) asserted defects in tank foundation design at the Terminal; (2) other complaints regarding conditions of the tanks; and (3) a series of incidents involving minor spills and movement of Product between tanks over a period of years that

caused frustration for Unipec and are described as cumulative and continuing violations of what the TLA requires of, at a minimum, "other comparable first-class terminal facilities."

109.    LBT responds that (i) there were no such Events of Default; (ii) any Events of Default were cured; and (iii) Unipec is barred from relying on any Events of Default as a basis for a right of termination because Unipec has elected the alternative remedy of continuing to accept and benefit from LBT's performance or is estopped by its conduct from asserting a right of termination.

### 1.    Tank Foundations

110.    Perceived problems with tank foundations were a subject of both of Unipec's notices of Events of Default, and LBT responded with repairs to Tank 7403 as described above. Unipec maintains that the repairs do not address fundamental design flaws in Tanks 7403 or all of LBT's other 7400 and 7500 series of tanks assigned to Unipec, which pose safety problems that no operator of comparable first-class terminal facilities would tolerate. These are allegations that implicate the basic obligation to provide safe storage and assert a claim of material breach of the TLA.

111.    The Parties presented extensive written and oral testimony regarding tank foundation design issues from Dr. Guzey on behalf of Unipec and from structural engineers Jeffrey Travis and Cliff Knight, working separately, on behalf of LBT. All were qualified experts, but Dr. Guzey and the other engineers differed significantly in their analyses of the available data.

112.    The principal issue in dispute was the extent to which steel rebars shown in the foundation design drawings are sufficient to enable the concrete to support the weight of a full tank of crude oil in a particular location where the foundation of each tank is indented to accommodate a trench holding the piping used to fill and empty the tank.

113.    The experts sought to analyze the "as built" condition of the foundations at that key location by extrapolations from design documents, without the benefit of physical sampling of the concrete (which would have involved structural alteration of a tank). They each did this largely by attempting to determine how many of the rebars in the design would be load-bearing at the critical points where the pipe entered the foundation, which was where the most significant cracks had been observed in Tank 7403.

114.    All of the experts' analyses involved both "hand calculations" and more sophisticated "finite element analyses" ("FEAs") involving computer computations. Dr. Guzey and the graduate students he supervised used FEA analysis only to determine where the areas of greatest stress were and, on that basis, how many of the rebars Dr. Guzey concluded were shown by the design to be located there. That number of rebars then was used as an input in Dr. Guzey's hand calculation. Instead of modeling concrete containing rebar in his FEA, Dr. Guzey modeled an "elastic" theoretical substance containing neither rebar nor concrete.

115.    Dr. Guzey concluded that none of the series 7400 or 7500 tanks was safe to use for storage of its full capacity of Product.  However, he opined that they could be used if filled only to one-half of their capacities. (As a consequence of this latter opinion, Unipec argues that, "at a

bare minimum," it should be charged storage fees for only half of the capacity of those now unused tanks. (Unipec Post-Hearing Br., para. 245))

116.    Messrs. Travis and Knight and their assistants, in contrast, performed FEAs of concrete containing rebar, on which they relied as more indicative than hand calculations. Their analysis showed that a larger number of the rebars should be included than Dr. Guzey used in his hand calculations, and their own hand calculations showed the tanks to be safe for use at full capacity.

117.    In addition, LBT's experts relied on a 1968 soil report relating to Tank 7403 for data in their calculations of the foundation's load bearing capacity. The report, which Dr. Guzey did not have when he prepared his reports (but analyzed shortly before the hearing), showed that the tank and its foundation were designed to sit atop six inches of compacted sand layered on top of "well compacted fill," which would affect the angle of friction used in the hand calculations and add to the strength of the foundation.

118.    Dr. Guzey chose to disregard the soil report because there was no evidence that the soil actually had been prepared in accordance with the soil design shown in it. However, that was equally true of the design documents on which Dr. Guzey relied for his conclusions: he assumed that the tank foundations were constructed in accordance with the specifications of those designs. There is no good reason to have disregarded the soil report on that basis.

119.    The timing of Unipec's disclosure of Dr. Guzey's reports to LBT also raises questions. He examined design documents relevant to all of the 7400/7500 series of tanks in February of 2020 and again in the fall of 2021, but Unipec did not call his conclusions to LBT's attention until December of 2021, much later than would have been expected if Unipec thought they raised safety issues of such alleged significance.

120.    Unipec's reliance on Dr. Guzey's conclusions also is questionable because it is inconsistent with Unipec's actions in April of 2020, after Dr. Guzey advised Unipec's counsel that the foundation of Tank 7403 was dangerous and that foundations of multiple tanks at the Terminal might raise similar issues. At and after the time of Dr. Guzey's original analysis, Unipec filled all but three of its 21 leased tanks—including 7400 and 7500 series tanks--with almost six million barrels of Product during the contango period.

121.    The Tribunal concludes that Unipec has not presented evidence that Dr. Guzey's analysis of tank foundations is more likely to be accurate than those of Messrs. Travis and Knight, which it is Unipec's burden to prove. Unipec therefore has not established that any failure by LBT to repair tank foundations violated a standard of care specified by the TLA that could constitute an Event of Default.

122.    Accordingly, Unipec's claim that it is entitled to terminate the TLA because of the condition of the foundations of the 7400 and 7500 series of tanks, or that Unipec is entitled to withhold payment of Storage Fees for those tanks for that reason, should be denied.

23

## 2.      Other Issues Involving Condition of the Tanks

123.    In addition to the tank foundation issue, Unipec claims that LBT has not maintained the leased tanks in accordance with the applicable TLA standard, which the Tribunal concludes is not limited exclusively to compliance with API and similar codes but also extends to maintenance of tanks in a manner that is "equal to … other comparable first-class operators of terminal facilities."

124.    It is common ground that the TLA standard includes, at a minimum, compliance with API 653, a widely-used American Petroleum Institute protocol that requires periodic inspection of tanks by a qualified API 653 inspector such as LBT's on-site API 653-certified engineer or Unipec's consultant Mr. Baker. Each tank must be emptied in order to be fully inspected, so inspections tend to be timed to coincide with maintenance cycles for the tanks.  After a full inspection, an inspector issues a detailed report on each tank, ultimately either certifying it as fit for use, or not, and typically including recommendations for additional steps that are not limitations on its use but should be taken in due course to improve the tank's conditions.

125.    The leased tanks at the Terminal passed API 653 certifications after their refurbishment, and Mr. Baker certified all of them as fit for use in his reports to Unipec in 2019. Mr. Baker's reports typically stated, for example:

> Tank 7516 is structurally suitable for use by Unipec America, Inc. There are code compliance issues which do not affect the structural integrity but should be addressed as maintenance cycles permit. There are also several items which address observations for improvements or modifications in line with industry practices. These items are not required to be addressed but may over time impact inspection frequency or tank integrity. (JX0034)

126.    Mr. Baker did, however, list "recommendations" for each of the tanks, stating that they "should be addressed as maintenance cycles permit," but placing the recommendations under a heading, "Required for Code or Integrity." Each report also included a number of "Considerations" suggested for possible actions (weed control, painting, etc.)

127.    LBT presented credible evidence that it did take regular steps to implement many of the inspection recommendations (and considerations), spending considerable sums in doing so.

128.    Unipec contends that this was insufficient because the recommendations are "Code compliance" issues and that terminal operators meeting "highest" standards, here meaning at least those of "other comparable first-class operators," would accept and act promptly to satisfy all of the recommendations of an API 653 inspector, but that LBT did not do so.

129.    The inspector's recommendations, in this case those of Mr. Baker, varied from addressing potential safety issues, such as replacement of wooden valve access structures that might pose a fire risk with metal ones, to essentially cosmetic advice about "repairing and sealing minor cracks," cleaning areas of corrosion and "painting as needed to prevent further deterioration." (JX0039, JX0033)  Unipec did not produce evidence of what any specific

24

"comparable first-class operator" does with such recommendations and instead offered general opinions of experts that others would have been more responsive in addressing them.

130.    In contrast, LBT's expert Mr. Knight testified that even the aspirational "highest industry standards" would require LBT only to meet API 653 requirements, allowing LBT, like other, comparable operators, to further adopt an inspector's recommended practices, or those recommended by other industry organizations, in their discretion according to what best suits the needs of a particular terminal. (Knight Opening Report at 21; Tr. 2812-14 (Knight)) Mr. Baker's reports, consistent with that analysis, recommended that various steps be taken as part of regularly scheduled maintenance cycles well into the future rather than as a condition to present operation. (*E.g.*, JX0033, JX0034)

131.    The Tribunal concludes that Mr. Knight's evidence is credible and that failure to correct all of the recommendations in Mr. Baker's report on the tanks by any particular time does not, simply as a result of their inclusion in the reports, constitute an Event of Default.

132.    Nevertheless, the tank maintenance issues raised by Unipec in its October 2, 2019 and/or July 17, 2021 notices, as supplemented, should be considered on their merits as potential individual or cumulative violations of the standard of conduct with respect to tank maintenance. Those issues included corrosion, alleged lack of cathodic protection, high-level alarms, vegetation issues and wooden stairs or platforms, among other things.

133.    LBT denies the existence or materiality of each of these charges of maintenance derelictions and contends that many of Unipec's allegations about the tanks either allege absence of systems that LBT actually had in place or concern problems that LBT proceeded to remedy in reasonably timely fashion.

134.    The evidence on these matters was voluminous. In summary, the witnesses painted a picture of tanks that were not modern and were connected with piping and valves that also were 50 years old and for which LBT's maintenance arguably lagged. The failure to replace all of the wooden structures around the tanks that could present combustion risks seems difficult to justify; yet the inspection reports (including Mr. Baker's reports) found the tanks involved fit for use, and his recommendations allowed for a considerable period of time to replace the wooden structures.

135.    However, the materiality of these issues as a basis for termination should be considered in the light of their relevance to the principal purpose of the TLA, which is to provide safe storage and return Unipec's Product to Unipec without loss beyond the TLA's prescribed loss tolerance provisions. In both respects, maintenance of the tanks did not hinder that purpose.

136.    In spite of their problems, the tanks leased to Unipec at the Terminal, with their pipes and valves, were used successfully to move vast quantities of crude oil from and back to vessels without any significant spills or safety incidents from 2016 to 2021. When tanks did experience significant problems, such as the collapsed floating roof and the foundation cracking of Tank 7403, LBT took them out of service and repaired them.

137.    Unipec's knowledge of the tanks' condition, including the alleged defects, over a considerable period during which Unipec continued to use the tanks also plays a role in an evaluation of the materiality of any maintenance imperfections. The Terminal is an old facility, which Unipec inspected as part of its due diligence when considering purchasing the Terminal. Unipec knew that old tanks would require substantial refurbishing, and completion of that project to Unipec's satisfaction was a condition precedent to the effectiveness of Unipec's TLA obligations.  Unipec accepted that the tanks were API 653-compliant before using them.

138.    When Unipec first became concerned about tank conditions in 2019 and reviewed Mr. Baker's inspection reports, Unipec voiced complaints but decided to withhold payment for only three of the tanks (Tanks 7403, 7410 and 7515). Unipec continued to pay for and, most significantly, profitably use all of the other tanks, including those for which Mr. Baker had recommended various improvements that Unipec now contends took them out of compliance with API 653.

139.    Tank maintenance issues therefore do not provide a sufficient basis for Unipec's claim that it is entitled to terminate the TLA.

### 3.    Operational Incidents and HSE Procedures

140.    As noted above, Unipec has been dissatisfied with LBT's unloading and loading of certain vessels from as early as 2016 and has experienced what at the time was unexplained migration of its Product from tank to tank.  Unipec also has criticized the adequacy of LBT's health, safety and environment ("HSE") procedures. Unipec has not suffered any significant loss of its Product as a result of these events, however, with the exception of an incident in 2020 in which about 22,000 barrels of Unipec's crude oil were placed in the wrong tanks and contaminated, as described above, for which LBT made a financial settlement with Unipec.

141.    Nor has there been any safety incident at the Terminal that led to injury to any person or to the environment.  Indeed, industry statistics show LBT's safety record to be better than that of industry participants generally.  (*See, e.g.*, evidence summarized in LBT Post-Hearing Br., App. A at 62-63)

### (a)    Operational Incidents

142.    Unipec presented evidence of 17 alleged operational incidents occurring over five years between 2017 and 2021 (*See* Unipec Post-Hearing Br. 26-30; LBT Post-Hearing Br., Attachment B; LBT Post-Hearing Reply Br., paras. 388-91):

(a) *Delta Commander* incident, 2017 (crude oil leak of less than 1 gallon)

(b) Variance incidents, 2017 and 2018 (within TLA loss tolerance provisions)

(c) *MS Afroditi* incident, 2017 (product migration between tanks, no product loss)

(d) *ISE Princess* incident, 2017 (variance during loading, within annual tolerance)

(e) Demurrage/dock congestion incidents, 2017 and 2018 (all demurrage claims paid)

26

(f) Fuel oil incident, 2018 (contaminated tanks cleaned, at LBT expense)

(g) *Hydra* incident, 2017 (pipeline leak, repaired by LBT)

(h) Stack/pump testing incident, 2018 (crude misdirected, returned without loss)

(i) *MT Parthenon* incident, 2020 (crude misdirected to wrong tanks; compensation paid)

(j) *Bergitta* incident, 2020 (crude diverted due to pipeline leak, no product loss)

(k) Tank 7401 purported leak incident, 2020 (small water spill under a tank)

(l) *Seahero* incident, 2020 (misaligned valve, no crude leak)

(m) *NS Lio*n incident, 2020 (diversion to another tank to speed vessel unloading)

(n) Tank 7401 migration incident, 2020 (measurement error, no product lost)

(o) (Alleged) Unauthorized product movement, 2020 (no product lost)

(p) Line displacement incident, May 2021 (discussed in paras. 257-61 below)

(q) *NS Bora* incident, December 2021 (delay in offloading from a ship)

143.    Unipec contends that, although the incidents, even when considered cumulatively, did not result in a material loss of its Product, they represent a large number of "near misses" that together establish a violation of the standard for Terminal operations, namely operations "equal to those of other comparable first-class operators of terminal facilities."

144.    Section VI of the TLA, quoted above, provides that Services are to be performed "in a safe and professional manner, and in accordance with generally accepted practices for the operation of storage facilities of a size and type comparable to the Terminal." This is consistent with the general standard of Section 2.5 of Schedule A, "at a very minimum equal to those of other comparable first-class operators of terminal facilities."

145.    It was accepted by all of the experts that crude oil terminal operations, including those at first-class terminal facilities, are inherently dangerous and that 100% success in avoiding significant spills as a number of vessels are unloaded and loaded, however desirable, is not humanly possible. Nor is 100% compliance with all regulatory authorities and adherence to code standards and recommended practices at all times expected in practice. (Tr. 3370, 3389, 3391 (Norman))

146.    In order to establish a sufficient deviation from standards to justify termination, Unipec therefore was required to show, first, what measurable standard of conduct "comparable first-class operators" typically meet and then that LBT failed to meet it.

147.    The evidence in this arbitration of what it is about operations at "other comparable first-class terminal facilities" that might set them apart from LBT's Terminal nevertheless was limited and largely subjective. Unipec objected to LBT's discovery requests for documents

showing safety and related types of records relating to operations at other terminals used by Unipec, and no such documents were produced.

148.    Unipec's experts did not testify, in other than conclusory terms, to a side-by-side comparison of the Terminal's operations with specific "comparable" terminals identifiable as "first-class" and operating at the same scale in the same environments. They referred generally to their experience consulting for or as employees of various companies and related specifics for one or two with which they had extensive personal experience. (*E.g.*, Tr. 3317-18 (Norman)) One of them, Michael E. Norman, provided a list of other terminals he said were "LBT's peer companies," but he admitted that "not all of these companies or individual terminals necessarily operate at that [first-class] level…" and did not identify which, in his opinion, did. (Norman Opening Report at 8-9) Mr. Norman said that he was not asked as part of his assignment to provide evidence of generally accepted practices of comparable oil storage terminals of a size and type similar to Limetree Bay. (Tr. 3335-36)

149.    Unipec's fact witnesses were called on to fill this gap in the evidence; but they also did not conduct any systematic study of LBT in comparison to other terminals and instead offered primarily general opinion testimony about industry comparisons. (*E.g.*, Tr. 1038 (Healey: "In my opinion, [LBT's operations] weren't typical of any terminal operations."); TR. 1250 (Acaries: "…dealing with the types of issues that we were dealing with it's just out of the norm.")) While some could offer personal experience based on one or a handful of terminals where they had worked, LBT's fact witnesses countered with contrary favorable comparisons with conditions and practices at their former employers' terminals.

150.    The Unipec fact witnesses complained of specific incidents involving small spills and misdirection of Unipec's Product at LBT's Terminal and offered general statements that the customer/terminal interactions were qualitatively better at some other terminals ("operations … ran smoothly and the customer did not need to get involved"; "The customer does not have to be as involved in operations as one does at LBT"), that their complaints were taken more seriously elsewhere and that they were treated better in their relations with personnel at other terminals. (*E.g.*, Li, Asagawara, Acaries and Conway WS, summarized in Unipec Post-Hearing Br., para. 341)  As stated by Unipec as its conclusion from this testimony, "first-class operators can experience incidents, but it is their proactive, not reactive, operational approach that sets them apart." (Post-Hearing Br., para. 348)

151.    As evidence of the significance of some of the incidents, Unipec points to internal LBT documents in which its then CEO, Brian Lever, described three recent events as "operational missteps" involving Unipec's crude that were "hugely disappointing and embarrassing." (RX-160, RX-255, RX-324) The incidents no doubt were disappointing and embarrassing to LBT, but that admission does not elevate them to the level of material breaches of the TLA.

152.    Unipec blames the problems it experienced in part on lack of sufficient capital investment by LBT. Unipec cites a December 2020 document in which an LBT executive described a possible $7,555,000 annual capital budget for 2021 as "the most basic capital required to allow the terminal to perform the lowest possible level of maintenance and does not allow us to match

competing similar sized terminals basic standards or make significant progress year on year."
(JX-121 at 10) However, LBT points out that this was not the maintenance budget and provided
testimony, unexplored in Unipec's cross-examination, that there was a "total expense budget of
over $50 million for 2021," substantially larger than this low-level alternative, leaving
unresolved questions about the document and making its relevance in context limited. (Rinker
WS, paras. 11-12)

153.    In response to Unipec's claims of comparative deficiencies, LBT presented evidence,
researched from public records, of a variety of major spills, accidents and operational failures
that occurred in recent years at terminals maintained by other companies that are considered
industry "majors" and were identified by Unipec as among the "comparables," all of which were
much more harmful and costly that any LBT incident of which Unipec complains. While those
other operators might or might not have been properly designated comparable and "first-class,"
Unipec never provided a consistent list of what companies and terminals it claimed were proper
measuring rods and made a specific comparison between them and the Terminal with respect to
their safety and performance.

154.    Following its experts' visit to the Terminal in October 2021, at a relatively late stage in
the arbitration, Unipec added nearly 200 claim details regarding miscellaneous alleged faults
beyond those based on an API 653 recommendation, not only with respect to tanks but also
implicating other infrastructure and procedures. LBT has responded to all of those items (Post-
Hearing Br., Attachment B), contending that they either have been or are scheduled to be
addressed during normal maintenance cycles or are trivial.  Again, Unipec offered general
opinions that "first-class" operators would be more attentive to all of these matters than LBT has
been, without specific comparable evidence.

155.    The Tribunal is not convinced that the evidence offered by Unipec was sufficient to
identify comparable "first-class" terminal operators for comparison and show that meaningful
comparisons have been made. But even if that were the case, there is an issue of the materiality
of any failure by LBT to follow practices that the other operators may follow. The question of
materiality with respect to the incidents of which Unipec complains involves how the standards
that LBT allegedly failed to meet in those cases relate to the central purpose of the Parties'
agreement. As discussed above, LBT maintains that the purpose is to receive, store and return
Unipec's Product, which LBT did successfully for about five years without any substantial loss
of Product or safety infraction, and that the incidents did not prevent that from happening and
thus should be considered immaterial.

156.    Unipec contends that the central purpose of the agreement should be described more
broadly, namely to provide specified "Services" that LBT is to perform and for which Unipec is
to pay. Unipec claims that Section VI of the TLA, which defines "Services" to include generally
that LBT will "operate the Terminal in a safe and professional manner, and in accordance with
generally accepted practices for the operation of storage facilities of a size and type comparable
to the Terminal," requires a more granular analysis of operational matters. Unipec argues that
this concept of the central purpose makes all of LBT's operational and HSSE practices subject to
testing as possible bases for a finding of material breach.

157.    As stated above, the Tribunal considers the TLA's central purpose to be providing safe storage and return of Product. But assuming Unipec to be correct in its reference of all of the "Services," at least to the extent of its argument that each operational issue may be a potential source of an Event of Default, the legal requirement of materiality still must be met. To establish a right to terminate the TLA, Unipec must show that operational lapses were sufficiently frequent in comparison to those of other operators to make the "Services" not only imperfect but sub-standard in a material way.

158.    Unipec did not offer sufficient convincing evidence of how often other, specifically defined comparable operators experienced such incidents.  Unipec found these incidents annoying and evidence of a "condescending and derogatory attitude" toward Unipec (Unipec Post-Hearing Br. 14); but a party's "shaken faith" in a counterparty is not sufficient to justify termination of an agreement. *See Sinco, Inc. v. Metro-North Commuter R. Co.*, 133 F.Supp.2d 308, 312-13 (S.D.N.Y. 2001).

159.    Unipec also maintains that, though mostly minor in themselves, the incidents may have involved "near misses" showing carelessness that could in future lead to measurable harm. Unipec witnesses testified in general terms that they did not experience similar problems at other terminals. Again, however, Unipec did not support this speculation with evidence of comparable presence or absence of "near misses" at other terminals and opposed LBT's requests for discovery of its experience at such terminals.

160.    Finally, Unipec seeks to link its concern with operations at the Terminal to the drastic events that occurred in 2021 at the Limetree Bay Refinery, noting that the Refinery and the Terminal, though separately owned, at that time shared a common CEO and shared HSE personnel.  Unipec states that, "After the refinery disaster, [Unipec] had had enough" and "decided to never again store crude at the facility." (Unipec Post-Hearing Br. 15-16) However, Unipec produced no evidence beyond these limited personnel overlaps to support the assertion that Refinery problems have affected Terminal operations in a way that relates to TLA termination rights.

161.    These operational issues, individually or cumulatively, do not provide an appropriate basis for Unipec to terminate the TLA.

### (b)    HSE And Record Keeping Procedures

162.    Additionally, Unipec accuses LBT of "widespread deficiencies" in its HSE systems and procedures, supported by the testimony of its expert Mr. Norman and expanded upon at length in Appendix F to Unipec's Post-Hearing Brief, which includes many details not timely raised at the hearing. The allegations are many and include such items as "small number of HSE-focused employees;" "no evidence of daily 'walk-around' inspections;" "pressure relief valves are past due for testing or not tested at all;" and "hurricane readiness plan not complete." (Unipec Post-Hearing Br. 103-04 and Appendix F)

163.    LBT responds in detail to these allegations in Attachment A to its Post-Hearing Brief and in a separate Response to Appendix F submitted with LBT's Post-Hearing Reply Brief. LBT

30

contends that Unipec's expert Mr. Norman misunderstands the facts regarding a number of his complaints and that the procedures he claims to have found lacking because he saw no adequate written evidence of them, such as daily "walk-arounds" and testing of equipment, in fact are in place.

164.    LBT also notes Unipec/Sinopec's inspection of the Terminal's HSE procedures in 2017-2018, which found them to be at least satisfactory and arguably superior. (CX0250)

165.    As in the case of Unipec's assertions regarding operational issues, the testimony in support of a standard for comparison with other comparable terminals was subjective and conclusory. Mr. Norman relied for his opinion largely on his experience at one former employer, Delek USA, and his knowledge of HSE "best practices" as expounded at meetings of industry associations such as the American Fuels and Petrochemical Manufacturers rather than on any specific comparisons with operators of comparable terminals.

166.    LBT's expert witness, Mark Landrum, on the other hand, compared LBT's HSE practices with those of four terminal operators with which he had experience (Marathon Petroleum, Sunoco, Enterprise and Buckeye), and found them to be comparable.  (Landrum Rebuttal Report at 2)

167.    LBT also notes that another Terminal crude oil storage customer, BP, conducted a 2019 HSE assessment of the Terminal that resulted in primarily favorable views of LBT's practices. (JX0067)

168.    The Tribunal concludes that Unipec has not established that LBT's HSE procedures fail to meet the standard of comparability with those of other operators of similar terminals.

169.    A related issue raised by Unipec is LBT's allegedly "shoddy recordkeeping of their claimed implementation" of HSE and other procedures, which Unipec maintains is "not normal." (Unipec Post-Hearing Br., para. 283)

170.    LBT responds that its regulatory compliance record, which involves significant relevant record keeping, is outstanding and that this conclusion is supported by the record. (Landrum Rebuttal Report at 14-15; CX0704)

171.    Accurate and complete record keeping no doubt is valuable to facilitate auditing of safety and other procedures, but Unipec failed to establish that there is any mandatory manner in which such record keeping must be done, beyond compliance with regulatory requirements, or that any defects in LBT's practices caused them to fail to meet the required TLA standard of comparability with other similar terminal operators.

172.    Any deficiencies in LBT's HSE procedures or its record keeping do not constitute an Event or Events of Default entitling Unipec to terminate the TLA.

### (c)    Election of Remedies, Estoppel and Notice

173.    LBT contends, as alternative arguments, that Unipec's termination claim is barred by the doctrines of election of remedies and equitable estoppel and by defects in Unipec's 2021 termination notice.

### (i)    Election of Remedies

174.    Unipec complained to LBT about various aspects of Terminal operations from as early as 2017 and continuously from 2019 through 2021, but Unipec did not decide to seek termination of the TLA until July 16, 2021. Instead, until that time the parties discussed and negotiated regarding LBT's efforts to improve tank conditions and operations and, most importantly, Unipec made the decision not only to pay Storage Fees but to continue using the Terminal extensively (with the exception of certain tanks) to Unipec's great profit during the contango period in 2020-2021. LBT maintains that this conduct establishes an election to continue receiving the benefits of the contract until July 16, 2021, which has the legal effect of affirming the contract up to that time. Only one of the operational incidents on which Unipec relies, the *NS Bora* ship offloading events of December 2021, occurred after Unipec gave its notice of intent to terminate (at such time as this Tribunal rules on its right to do so), and LBT contends that it provides no sufficient basis for a finding of Material Breach.

175.    New York law provides that, "upon learning of a breach, a party must choose between terminating the contract and continuing performance." *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F.Supp.2d 384, 415 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 56 (2d Cir. 2009). A party makes an election when it knows or reasonably should know of a material breach and either "continues to perform under the contract or … accept[s] the performance of the breaching party." *Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1011 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 108 (2d Cir. 1996). Continuing payment of money may constitute an election, as may continuing to receive the benefits of the agreement. A contract party is entitled to act reasonably and need not make an election "until the time arrives when, by the terms of the contract, the party entitled to elect must render some performance. Then either performing or failing to perform will indicate an election." *Bigda v. Fischbach*, *supra*, 898 F. Supp. at 1013.  If a party elects to accept performance, it of course retains the right to claim any appropriate damages.

176.    Unipec claims that the foregoing election of remedies doctrine "has no application to the TLA's express termination provisions." (Unipec Post-Hearing Br. 150 (heading to Section V.A.1))  But the cases cited by Unipec merely confirm the uncontroversial point that common law principles can be amended by contractual agreement; none supports the conclusion that the doctrine is inapplicable.  (*Id.* at paras 388-390)  To the contrary, in several of the cases cited by both Parties, and in which election of remedies precluded termination, the underlying contract contained a termination provision, sometimes also including notice and cure provisions like those in the TLA. (*E.g., ESPN, Inc. v. Off. Of Com'r of Baseball*, 76 F. Supp. 2d 383, 391 at n.6 (S.D.N.Y. 1999); *Bigda v. Fischbach, supra*, 898 F. Supp. at 1008) There is nothing inherently incompatible with having a contractual termination provision and applying the election of remedies doctrine. Nor does the existence of a "no-waiver" clause in the TLA (*see* Sched. A, Sec. 5.2) impact the application of the election of remedies doctrine.  (*See, e.g., Bigda v. Fischbach*, *supra*, 898 F. Supp. at 1014)

32

177.    Unipec further contends that it stated its intention to reserve its right to terminate while continuing performance and acted reasonably in refraining from making that election so long as the Parties continued to negotiate over cure of defects. However, a party cannot reserve its rights to terminate once it makes an election to continue performing, as Unipec did during the contango period. *ESPN, Inc. v. Off. of Com'r of Baseball*, *supra*, 76 F. Supp. 2d at 392-93. Also, Unipec conceded that, at the time of its termination notice in July 2021, "the parties had long-ceased any commercial negotiations for LBT to resolve the defaults." (Pre-Hearing Br., para. 128)

178.    The doctrine of election of remedies is distinct from the principle of waiver, which requires that a party make an intentional decision to relinquish its right to terminate a contract. Election, in contrast, "does not depend upon an intention to surrender a right." *Apex Pool Equip Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969). All that is required for election is that a party continues to accept the benefits of the other party's performance. Those benefits, together with damages for any partial breach, provide a dissatisfied party with full legal remedies.

179.    The Tribunal concludes that Unipec elected to accept the very substantial benefits of LBT's performance under the TLA before and during the contango period and until July 16, 2021, so that the asserted contract breaches before that date, even if material, which the Tribunal holds they are not, would be insufficient as a basis for termination.

180.    Finally, Unipec claims that its experts discovered additional evidence of tank foundation problems when its representatives visited the Terminal in 2021, after the termination notice date. LBT disputes that; but for the reasons explained above, no tank foundation defects discovered at any time were shown to have been material. Nor were any other tank-related issues or operational failures post-July 2021 shown to be sufficient to establish a Material Breach that would provide a basis for termination. The doctrine of election of remedies therefore is an alternative basis for rejection of Unipec's claim of a right to terminate the TLA.

### (ii)    Equitable Estoppel

181.    LBT also maintains that Unipec's termination claim is barred by the doctrine of equitable estoppel because Unipec assured LBT at various times that it wished to continue performance of the TLA in order to induce LBT to spend considerable sums on improvements and repairs responding to Unipec's complaints.

182.    That doctrine applies where, on behalf of the party estopped from claiming termination, there is "(1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive of the true facts. The elements pertaining to the party asserting estoppel are (1) lack of knowledge of the true facts; (2) good faith reliance; and (3) a change of position." *Rich v. Orlando*, 128 A.D.3d 1330 (4th Dep't 2015) (citations omitted).

183.    LBT writes that "Unipec's conduct over the years conveyed the impression that Unipec wished to work constructively with [LBT] to have [LBT] address the issues Unipec raised and masked its true intention of terminating the contract." (LBT Post-Hearing Reply Br., para. 427)

But in fact, there is no persuasive evidence of any such masked "true intention." Unipec genuinely sought to resolve issues with LBT, but the parties were unable to do so to Unipec's ultimate satisfaction. The element of intent to create a false impression concerning relevant facts is missing.

184.    The doctrine of equitable estoppel therefore is not applicable in this case.

### (iii)    Notice

185.    Section 3.5 of Schedule A, the "Default" section, provides that if LBT "fails to comply with its material obligations" under the TLA, Unipec must notify LBT "in writing of such failure."  LBT than has an opportunity to cure within 30 or 60 days, only after which is there deemed to be an Event of Default.

186.    LBT maintains that the requirement of notice should be strictly enforced and that Unipec failed to give LBT notice of and a right to cure many of the specific operational issues that now form the basis for the claim of a right to terminate. These include all events (such as operational incidents) that occurred prior to October 2, 2019 and other specified occurrences (including those not asserted in the arbitration until near the conclusion of the merits hearing). (LBT Post-Hearing Br., para 437; Post-Hearing Reply Br., para. 437) LBT contends that these events for which notice was not given cannot be the basis for an Event of Default.

187.    Because of our determinations above, it is not necessary to address the defense based on inadequacy of notice of some of the alleged Events of Default.

### 4.    Conclusions Regarding Unipec's Termination Claim

188.    Even assuming the many issues of which Unipec complains, or at least some of them, constitute violations of the standard of performance required by the TLA, those possible multiple breaches are not sufficiently material cumulatively to defeat the object of the Parties in entering into the contract. Unipec therefore has not established a basis for a right to terminate the TLA.

189.    Alternatively, Unipec's termination claim also is barred by the doctrine of election of remedies.

190.    Unipec is not entitled to the declarations it requests: that LBT has failed to comply with its material obligations under the TLA; that Unipec notified LBT in writing of each such failure; that LBT has failed to cure such failures or breaches in accordance with Section 3.5 of Schedule A of the TLA; and that such breaches shall be deemed an Event or Events of Default under the TLA that permit Unipec to immediately terminate the TLA upon notice to LBT without liability other than as provided in the last paragraph of Section 3.5 of Schedule A.

### C.    Designation of Tanks and Movement of Product Between Tanks

191.    Each Party seeks declaratory relief with respect to a specific subject of Terminal operations: tank designation and Product movement between tanks. LBT contends that the plain language of Section II provides that the "**Tanks** to be used by [Unipec] shall be **determined by**

34

**[LBT] and notified to [Unipec]**," without any requirement of Unipec's agreement to LBT's determination of particular tanks or that notice be given prior to LBT making that determination.

192.    In response, Unipec relies in part on language in Section V, which makes Unipec's payment of Storage Fees dependent on the number of barrels of "**shell capacity** made available and **confirmed by Customer**…" Unipec contends that only capacity (meaning, Unipec says, specific tanks) that it has "confirmed" may be used in computing its payment obligations.

193.    Unipec also points to Section III(A) ("Storage Capacity"), which states that **capacity** "shall be made available on an incremental basis **upon prior notice** to [Unipec] and [Unipec] shall **confirm receipt of such notice** . . . The tanks ("Tanks") leased to [Unipec] are **described** in Schedule F . . . as such **table** is **amended from time-to-time by the Parties** to reflect Tanks leased to [Unipec]."

194.    Finally, both parties note the definition of "Tankage" or "Tank" in Section 1.14 of Schedule A as the tankage "**identified on Schedule 'F'** hereto **and selected by [LBT]** and notified to [Unipec] for lease to [Unipec] in accordance with this Agreement."

195.    Unipec reads these provisions together to require both prior notice of tank substitution and "confirmation" of the substitution upon Unipec's agreement to an amendment of Schedule F.

196.    LBT reads the terms together in a different way. LBT contends that Section II is a specific provision addressed to tank selection and that other terms on which Unipec relies are "inapposite or unrelated." (LBT Post-Hearing Br., paras. 172-74) LBT contends that the word "confirmed" as used in Section V and Section III(A) should be understood to refer only to confirmation of receipt of notice; that the reference to "prior" notice in Section III involves only **changes** in storage **capacity** rather than designation of particular tanks; and that Schedule F's reference to amendment "by the Parties" pertains only to a ministerial or "procedural" record in a "table" of the (unilateral) determinations of tank **identity** made by LBT. (LBT Post-Hearing Reply Br., paras. 442-45)

197.    Both Parties take the position that these provisions, considered together, are clear on their face and do not require consideration of parol evidence. Unipec nonetheless points to an internal LBT email (RX135) in which the Vice President of Operations wrote to the CEO: "The reality is the contract is so poorly written, we never have the standard rights of substitution that most terminalling contracts enjoy. Unipec never has to give up 7512 or 7516, at least the way I read it."

198.    LBT denies the relevance of this evidence and cites testimony that it was superseded after "further guidance from counsel on this." (Neal, Tr. 939-41)

199.    The Tribunal concludes that this issue should be resolved on the basis of the plain meaning of the TLA, considered in the context of the circumstances of the Parties and the facility at the time of their entering into the TLA, without need to consider parol evidence. Section II of the TLA states that "Customer will have the exclusive right to utilize up to ten million (10,000,000) barrels of Tankage set forth on Schedule "F" hereunder, and unencumbered and priority access to the Terminal in accordance with this Agreement." This language clearly and

unambiguously provides that all of the Tankage to be utilized for storage of Unipec's Product will be provided by tanks specified on Schedule F and that the tanks so chosen are reserved for Unipec's exclusive use. Consistently with this, Section III of the TLA identifies the basis of the tank lease as follows: "The tanks ('Tanks') being leased to Customer are described in Schedule F attached hereto by tank number, capacity, initial Product, and location in the table below, as such table is amended from time-to-time by the Parties to reflect Tanks leased to Customer."

200.    When the Parties entered into the TLA, they had an express and mutual agreement as to which tanks were to be maintained for Unipec's exclusive use for storage of Product, and those tanks were identified on Schedule F. No tanks or capacity may be removed from or added to Schedule F without an amendment as agreed by the Parties.

201.    The tanks selected from among those listed on Schedule F, as well as those selected for any specific Product delivery, must be "notified" to Unipec. When Unipec's Product is to be unloaded from a vessel, LBT has the right to determine which of the Schedule F tanks that have been selected to provide the leased capacity will be used for its storage and must notify Unipec in advance of that decision.

202.    In the operation of the facility, it is commercially reasonable for LBT, as the Operator, to determine the plan for utilizing storage capacity, based on considerations such as logistics, piping, valves and tank conditions. Similarly, it would be important for Unipec, as the owner of the Product, to have advance notice of which Schedule F tanks are selected for its Product in order to be able to inform LBT of any reason why the selection might not be appropriate, such as potential for mixing different grades or contamination. If Unipec were not provided with notification in advance, the right to be notified would be rendered meaningless and provide no opportunity for Unipec to give its views on any reasonable concern it might have regarding the tank(s) determined by LBT.

203.    The Tribunal therefore concludes that the TLA gives LBT the right to determine which of the Schedule F tanks are to be utilized for Unipec's leased capacity and into which tank or tanks Unipec's Product is to be transferred when unloaded from a Vessel; but Unipec has the right to receive prior notice of all such determinations so that it may inform LBT of any reasonable concern it might have regarding any such determination. The Tribunal further concludes that the table set forth in Schedule F may not be amended to add or remove tanks or capacity that may be utilized for Unipec's Product in the absence of an amendment as mutually agreed by the Parties.

204.    LBT's right to "determine" the tanks to be used is also subject to the limits on Unipec's payment obligations contained in the TLA, such as, for example, Section V's provision restricting payment of fees when tanks are out of service.

205.    These provisions of the TLA do not resolve the dispute between the Parties surrounding the matter of tank-to-tank transfer or movement of Product. The TLA does not expressly authorize LBT to act unilaterally to relocate, move or transfer Unipec's stored Product from one tank to another tank, even if the movement is to another tank listed on Schedule F. This important right to control Product movement from tank to tank cannot be inferred from the fact

36

that LBT has the right to determine which Schedule F tanks will be utilized when Product is transferred from a vessel to be stored.

206.    LBT argues that its express right to select tanks would be nullified if LBT could not move Product "into the tanks that it selected" for that Product. However, Section VI(F) of the TLA, which describes generally the Services to provided by LBT, is not a unilateral grant of authority. It states that LBT is to "Transfer or load Product onto or from Vessels per Customer's direction…." The potential for tank-to-tank transfers is recognized, because Section VIII(C) establishes Unipec's obligation to pay a "Transfer Fee" should Unipec request a transfer of Product from one of its allocated tanks to a tank allocated to a third party. Section VI(H) calls for reporting of Product movement in accordance with Unipec's "reasonable request and customary practice." These references to Product movement or Transfers are not precisely on target to resolve the current dispute, but their limited guidance provided demonstrates that the Parties expected that movement of Product stored within the Terminal would be guided and occasioned by Customer direction.

207.    Product movement in a tank-to-tank transfer is a process that adds exposure to Product mishandling, Product loss, inventory shrinkage and contamination, among other risks associated with tank storage and Product movement operations.  After the Product is safely offloaded from a vessel and transferred to a Schedule F tank for storage, nothing in the TLA grants LBT a right to conduct tank-to-tank transfers for LBT's convenience, in order to prepare to serve other customers or to accommodate the adjacent Refinery. In Section VI(B), the Parties agreed that Unipec would have "priority" access and priority usage of the Tankage to be provided to Unipec. Moving Unipec's stored Product for LBT's convenience or economic benefit, without notice and Unipec's consent, would be inconsistent with the required "priority" usage.

208.    There was little evidence of any uniform "customary practice" in the industry regarding product movement, particularly where the relevant agreement may have been ambiguous or silent on the subject; but what there was favored Unipec to at least some extent. For example, Unipec's Ms. Acaries testified that a customer holds title to Product while it is in storage and that, at least in her experience, terminal operators do not move customers' product without prior notification and consent, "absent an emergency situation." (Acaries WS, paras. 77-79; *see also* Tr. 1583 (Weaver)).

209.    The Tribunal concludes that LBT is not entitled to move Unipec's Product that is stored in a particular Schedule F tank to any other tank(s) in the absence of Unipec's request or advance consent.

210.    LBT therefore is entitled to a declaration that, under the TLA, LBT has the exclusive, unilateral right to determine which tanks shown on Schedule F, as it may be amended from time-to-time by agreement of the Parties, shall be utilized for the storage of Unipec's Product, and LBT must give Unipec advance notice of such determination. However, LBT may not move or transfer Unipec's stored Product to any other tank, whether it is on Schedule F or otherwise, without Unipec's prior consent.

211.    All other requests for declarations dealing with these subjects should be denied.

212.     Unipec is not currently storing Product at the Terminal, so there is no threat of harm justifying an injunction with respect to Product movement as requested by Unipec.

### D.     Disputed Storage Fee Charges

213.     LBT, which initiated the arbitration as Claimant, seeks damages for withheld payments relating to Tanks 7403, 7410, 7515 and 7513 at times when LBT contends that those tanks were not out of service and were available and certified as fit for use.  LBT calculates the unpaid amounts for all of these tanks, through August 2022, to be $27,920,070, composed of $26,834,070 in Storage Fees for the disputed tanks plus $1,086,000 that LBT claims Unipec has withheld improperly from Storage Fees (a) as a contractual penalty for the period from June 2019 to December 2019 related to LBT's delayed completion of the single-point mooring system ("SPM") ($664,000, later reduced as discussed below) and (b) for amounts of Unipec Product claimed lost during a 2021 product transfer operation ($422,000) (LBT Post-Hearing Brief, para. 236; Neal WS, paras. 78-79))

#### 1.   Tank 7403

214.     As a result of Mr. Baker's inspection in 2019, Tank 7403 was made the subject of further investigation because of observed cracks in its foundation and was not used, even though it had not been required by Mr. Baker's report to be taken out of service. In March 2020 LBT informed Unipec that the foundation of Tank 7403 had been repaired and that the tank was ready to be used. Unipec maintained that it wished to send an inspector to look at the tank but could not do so because of Covid-19 and would not resume payment until Unipec had carried out that inspection. (Charles WS, para. 362) Mr. Baker thereafter conducted a partial API 653 "external" inspection of Tank 7403 in October 2021 and concluded that it was not fit for use solely because of foundation issues as diagnosed by Dr. Guzey. All of his other concerns about the tank in 2021 were issues that he agreed could be addressed in normal maintenance cycles.  (RX0191; Tr. 3159-62 (Baker)) Unipec's continued refusal to pay for Tank 7403 after its repair therefore rests entirely on questions about the safety of its foundation.

#### 2.   Tank 7410

215.     Unipec's October 2, 2019 letter raised issues regarding failed valve containment and tank bottom extension corrosion in Tank 7410 based on Mr. Baker's observations during his August 2019 inspection, although Mr. Baker's report on the tank rated it structurally suitable for use. In his 2021 external inspection, Mr. Baker found this tank not structurally suitable for use because of foundation issues diagnosed by Dr. Guzey. He identified no other basis for removing Tank 7410 from use (although not all of his prior recommendations had been complied with) and testified that the bottom extension corrosion, which had not been mentioned in his 2019 report, simply required further monitoring.  (RX0196; Tr. 3016 (Baker)) In this case, too, Unipec's basis for withholding payment due to lack of API 653 compliance, which began in October 2019 (Neal WS, para. 74), is essentially the opinion of Dr. Guzey.

### 3. Tank 7515

216.    Tank 7515 was added to Unipec's schedule of leased tanks as of June 2019, as a replacement for Tank 7513. Unipec's October 2, 2019 letter maintained that pontoons on the floating roof of Tank 7515 needed repair, and LBT contends that those repairs were carried out while the tank remained in service and were completed in April 2020. Mr. Baker approved Tank 7515 as fit for use in October 2019, and he testified that temporary repairs to its floating roof could be made "in service." (Tr. 3017) Unipec nevertheless began to withhold payment in June 2019 (Neal WS, para. 74), and Mr. Baker determined that Tank 7515 was not fit for use in 2021. As in the case of Tank 7410, Mr. Baker based his 2021 determination on Dr. Guzey's opinion about tank foundations. (RX0199) Mr. Baker also testified that, although he did not go up to the roof level of any Tank during his October 2021 visit, he was shown or given access to documentation attesting to floating roof repairs having been made. (Tr. 3065-66) Mr. Baker opined that other non-structural issues with Tank 7515 that he observed in 2021 could be addressed while it was in service, during normal maintenance cycles. (Tr. 3147-48)

217.    Tank 7515 was removed from Unipec's tank schedule in July 2020, and LBT seeks unpaid fees for that Tank only through the July 2020 service month. Beginning in August 2020, LBT leased Tank 7515 to another customer until July 2021. At that time, when LBT's in service repairs to Tank 7513 were complete, Tank 7513 was re-added to Unipec's schedule of leased tanks available to Unipec as a replacement for Tank 7515. (Neal WS, para. 76)

218.    Unipec takes the position that Mr. Baker's 2021 report, which in turn relies essentially on Dr. Guzey for its structural fitness conclusion, justifies non-payment for Tank 7515 for the months from April through July 2020. Unipec also maintains that it never "confirmed" the addition of Tank 7515 to its tank schedule because it was never satisfied that LBT had shown completion of necessary repairs.

### 4. Tank 7513

219.    As noted above, Tank 7513 suffered a partial floating roof collapse in 2019, following which LBT took it out of service and spent approximately $7 million for its repair. The Tank then passed an API 653 inspection conducted for LBT and was re-added by LBT to Unipec's lease schedule beginning with the month of July 2021, in place of Tank 7515. (Neal WS, para. 61) LBT seeks amounts invoiced and unpaid for that tank from July 2021 to the present.

220.    Unipec has continued to withhold payments for Tank 7513 because it does not consider the tank to be API 653 compliant or that LBT has produced adequate proof of completion of repairs. Unipec also contends that it is excused from payment because Unipec has not "confirmed" Tank 7513's addition to the schedule of leased tanks.

221.    In addition, Unipec maintains that addition of the full capacity of Tank 7513 would bring the total leased capacity above 10,000,000 barrels and that Unipec should not be obligated to pay for capacity that would cause a violation of the 10,000,000 barrel TLA limit.

222.    As a third point with respect to this tank, Unipec contends that Tank 7513's re-entry into service came after Unipec had sent its July 13, 2021 termination notice, when the Parties were

required by the TLA to be "winding up" their affairs in anticipation of termination. Unipec argues that the implied covenant of good faith and fair dealing did not permit adding another tank to Unipec's schedule at that time. (Unipec Post-Hearing Br., paras. 523-26)

223.    LBT responds, first, that Tank 7513 has passed an API 653 inspection and that Unipec chose not to ask Mr. Baker to make any inspection of that tank during his October 2021 site visit. According to LBT, the claim that the tank does not meet API 653 standards was raised only in post-hearing briefing and appears to be based on Dr. Guzey's conclusions regarding all 7500 series Tank foundations. (LBT Post-Hearing Reply Br., paras. 488-91)

224.    LBT also notes that, while the TLA authorizes Storage Fees for capacity up to the TLA's 10,000,000-barrel limit, tanks cannot be added in precisely uniform increments. LBT points to the Parties' course of performance under the TLA that involved using tanks that had slightly more than 10,000,000 barrels of capacity, for which Unipec paid. (LBT Post-Hearing Reply Br., paras. 483-87)

225.    Finally, LBT notes that it began leasing Tank 7513 to Unipec on July 1, 2021, prior to Unipec's termination notice.  LBT also contends that it had no obligation to "wind up" affairs under what it considers an improper termination notice and that the implied covenant of good faith and fair dealing, to which Unipec refers, cannot negate explicit rights under a contract. (LBT Post-Hearing Reply Br., paras. 492-96)

### 5.   Conclusions regarding Tank Storage Fees

226.    The issue with respect to Storage Fees for Tanks 7403, 7410, 7515 and 7513 is not whether LBT's maintenance of tanks generally, or of those tanks in particular, or even the Terminal as a whole, failed to meet a defined minimum standard of comparability to first-class operators of similar terminals, which the Tribunal concludes Unipec failed to prove in this proceeding.  Those claims, as well as Unipec's claims regarding structural foundation problems and insufficient attention to maintenance of those tanks, are rejected by the Tribunal in connection with Unipec's termination claim. Separately, however, Unipec asserts a right to withhold payment of Storage Fees for these four tanks alone, which Unipec elected not to use at various times (in the case of three of them, declining use even during the highly profitable contango period).

227.    It was common ground between the Parties that, at a minimum, first-class terminal operators would require all tanks to meet API 653 standards of fitness for use. To avoid payment obligations in a case such as this, where there was an absence of adequate proof of other "first-class" standards for operations, including tank maintenance, beyond API 653, Unipec must establish that the particular tanks were unavailable for its use during specific periods of time when each tank did not meet the API 653 standards of fitness for service because repairs or modifications to the tank were necessary at the times in question and either were inadequate or not complete or for some other contractual reason.

228.    Articles X and XI of the TLA condition Unipec's obligations on LBT's satisfaction of various conditions related to LBT's refurbishment and modification of the tanks to Unipec's

satisfaction. LBT completed those improvements and provided API 653 inspection reports to
Unipec, which retained a third-party contractor to conduct "paper reviews" of those reports, after
which Unipec's Mr. Healey communicated with LBT extensively about the reports and tank
selection.  (Healey WS, paras. 28-36) The Parties eventually identified the specific Tanks agreed
to be assigned for Unipec's use on Schedule F.

229.    Section IX requires LBT to "perform any necessary refurbishment and/or modifications
to the Tanks that are necessary to enable [LBT] to provide the Services pursuant to this
Agreement …," including "at a minimum" assuring their compliance with API 653 certification
requirements, and to "consult with Customer with respect to any refurbishments and/or
modifications to the Tanks." It further requires LBT to provide Unipec with written confirmation
from contractors or service providers "confirming completion of the modifications and
refurbishment" and grants Unipec "the right to examine such certifications, review documents,
and make further inquiries to [LBT] regarding such contractors and other service providers with
respect thereto."

230.    These provisions appear to be directed primarily to the initial refurbishment and
modification of the tanks, but they are not limited by their terms to those events. Unipec has a
general right to inspect papers related to tank modifications and "make further inquiries"
regarding the work of contractors or others involved in modifications to the tanks on Schedule F.
The TLA does not provide Unipec with any subsequent rights of inspection or approval of the
completion of that work, but Unipec may take any disagreement over its rights to inquire or
about tanks' fitness for use to arbitration.  In addition, the TLA recognizes in Sections IV and V
that tanks may be "temporarily unavailable" or being "repaired, or otherwise placed out of
service by [LBT]," with consequences in reduced Storage Fees during such intervals but without
reference to any right for Unipec to veto such LBT decisions.

231.    Consistent with Unipec's right to make inquiries, the Parties agreed that Unipec could
conduct its own API 653 inspections in 2019, when Mr. Baker inspected the tanks and found all
of them, including the tanks here in issue, structurally fit for continued service, with a caveat
about Tank 7403's foundation requiring further inspection. His reports noted various
"recommendations" for further improvements of tanks that he considered "required for code or
integrity" at the time of his inspections, but he wrote that these issues "should be addressed as
maintenance cycles permit." (*E.g.*, JX0033 at 3, JX0042 at 3) The weight of the persuasive
evidence established that API 653 does not bar use of a structurally sound tank, and that it may
be kept "in service," while such some types of modifications needed for complete code
compliance are implemented. (*See* Knight Opening Report at 21; Tr. 2812-14, 2937, 2942
(Knight); Tr. 3159-62 (Baker)) Mr. Baker testified that LBT had made progress in addressing
some of what he viewed as open issues between his initial inspections in 2019 and his later 2021
inspections. (Tr. 3060)

232.    Because of the various issues raised by Unipec in 2019, LBT undertook repairs of the
four tanks as described above and kept Unipec advised of repair reports and other information as
part of the Parties' ongoing discussion of all "Appendix A" open items after 2019. (Charles WS,
para. 375) When the repairs were completed, LBT notified Unipec of that fact and offered

documentation. (*e.g.*, CX0783) The documents available did not include original design drawings for Tank 7403, which could not be located and for which other materials were substituted and used by Dr. Guzey.

233.    Unipec's reasons for withholding Storage Fees have become more expansive as the arbitration has proceeded; but in an internal Unipec email of January 6, 2020 (J0070), when the repairs were being undertaken, Mr. Asagawara wrote that Unipec was withholding payment for Tanks 7403, 7410 and 7515 because of foundation cracks issues (7403), incompleteness of repair of valve containment (7410) and incompleteness of roof pontoon repairs (7515). At the hearing, LBT offered evidence that it completed the foundation (7403) and valve containment (7410) repairs by March 2020 and completed the pontoon repairs (7515) in April 2020. (Charles WS, paras. 366-70; RX0313)

234.    The Terminal remained in operation, and travel to it was possible during the Covid pandemic (Tr. 989 (Neal)). Unipec used the Terminal extensively during 2020-21. Unipec has made only limited use of the opportunity to inspect or evaluate tank repairs, concentrating on foundation repairs of Tank 7403, discussed above, and Mr. Baker's observation of three tanks again in October 2021, which were external only and did not involve full API 653 inspections. Largely on the basis of his 2021 visit, Mr. Baker concluded that applicable standards were not satisfied with respect to most of the leased tanks generally, primarily because LBT's maintenance program was "reactive in nature and not at the level that would be expected from a terminal maintaining their assets consistent with a 'first-class' terminal adhering to highest industry standards" (Baker Rebuttal Rep. 21). His external inspection reports on Tanks 7403, 7410 and 7515 based his conclusion that they do not meet API 653 standards essentially on Dr. Guzey's opinions concerning tank foundations and also referred to recommendations from Mr. Baker's 2019 report that were not completed.

235.    The evidence in this case about tank conditions and their availability for Unipec's use, including Mr. Baker's written testimony, focused heavily on Unipec's termination claim, with relatively little attention to the completion of the repairs to Tanks 7403, 7410 and 7515 (aside from their foundations, with respect to the status of which Mr. Baker deferred to Dr. Guzey).  At the hearing, Mr. Baker conceded that, except for Dr. Guzey's reservations, all of the Tanks were structurally fit for use without capacity limitations. (Tr. 3159-62)

236.    At least one of those three tanks actually was used after completion of repairs, because LBT partially mitigated its loss of Storage Fees for Tank 7515 by leasing it to another customer. Indeed, as is discussed below, Unipec claims that LBT's mitigation of damages should have been more extensive, including also leasing Tanks 7403 (in spite of the alleged serious defects in its foundation) and 7510 to other customers during the contango period in 2020-21, when tank capacity was in short supply in the industry. This issue is discussed further below.

237.    Unipec therefore has not effectively rebutted LBT's claim that Tanks 7403, 7410 and 7515 were available for use during the periods for which LBT claims Storage Fees after their repairs, that information about the repairs was provided or available to Unipec and that Storage Fees for them are due. Unipec's defense based on the absence of its "confirmation" that Tank

7515 could be added to its lease schedule in June 2019 for a time in place of Tank 7513 is insufficient for the reasons explained below in relation to the reintroduction of Tank 7513.

238.    As a partial defense to the claims for Storage Fees for these tanks, Unipec notes that LBT includes in its claims Storage Fees for periods during which the three Tanks were undergoing the repairs but, according to LBT, remained structurally sound and fit for service.  Unipec contends that it should not be responsible for fees during those repair times, which total $6,983,000.

239.    Article IV of the TLA provides that, "In the event that Tanks are temporarily unavailable for any reason, including but not limited to inaccessibility, [LBT] will adjust charges (e.g. Storage Fees) hereunder to obligate Customer for only that part of the Terminal or Tankage that is available to Customer for receipt, storage, and delivery of the Product in accordance with this Agreement …" This does not assist Unipec, because the Tanks remained accessible and available for use during repairs.

240.    Article V of the TLA bars LBT from charging Storage Fees for any period when a tank is "being examined, repaired, or otherwise placed out of service by [LBT], or otherwise use of the tank(s) has ceased other than where use has ceased due to actions of the Customer." This applies only to repairs that take a tank "out of service," and the Storage Fees in issue do not cover any such period. Use of the tanks by Unipec "ceased," but that was due solely to Unipec's own actions. The TLA does not excuse payment of Storage Fees if a Customer makes its own judgment that certain tanks are not fit for its use and therefore "ceases to use" them. To avoid payment for tanks certified by Unipec's own API 653 inspector as fit for use, as these tanks were until at least October 2021, Unipec is required to establish that its judgment about lack of fitness for use during the repair period was correct and LBT's was incorrect.  Unipec has not shown that in this proceeding.

241.    Tank 7513's situation is different in that LBT did take it out of service after the floating roof collapse in 2019, after which Tank 7513 was repaired and returned to service by LBT as of July 1, 2021. (CX0783) Unipec's defense to LBT's claim for Storage Fees for Tank 7513 since that time is that (1) the TLA permits Unipec to "confirm" the tanks on its lease schedule and it has declined to do so for the reintroduction of Tank 7513 (and also for reintroduction of Tank 7515 after it was repaired); (2) Tank 7513's capacity would cause the leased capacity to exceed 10,000,000 barrels; and (3) the parties should have been "winding up" their relationship by July 2021 because of Unipec's termination notice.

242.    The TLA contains no basis for the first of those defenses. As is discussed above, Unipec has the right to confirm its agreement on the tanks assigned for its use on Schedule F, as that may be amended from time to time.  Attachment 4 to Schedule F contains a list of many tanks, including 25 crude oil tanks, that were agreed by the Parties to be acceptable and available for Unipec's use. Unipec agreed to lease up to 10,000,000 barrels of capacity, to be provided as determined by LBT from tanks on Schedule F and made available to Unipec on an incremental basis as the tanks were refurbished. Unipec also has the option to lease even more capacity on a short-term basis pursuant to Section V of the TLA. In fact, however, Unipec never leased more than 21 of those tanks, which were sufficient to provide the 10,000,000 barrels of capacity.

243.    Effective in August of 2020, LBT removed Tank 7515, a tank for which Unipec was not paying Storage Fees, "from the lease" (*i.e.*, from the list of tanks being used to measure the leased number of barrels of capacity that were reserved for Unipec). LBT did that in order to make Tank 7515 available for use by BP, which was supplying crude oil to the Limetree Bay Refinery. (Tr. 909-11 (Neal)) As a result, for a time from August 2020 until July 2021 LBT only charged Unipec Storage Fees for the lease of 20 tanks. In June of 2021, LBT selected Tank 7513, after its repairs, to "add to the lease" as of July 1, 2020 as the 21st tank in order to bring Unipec's leased capacity back up to (and slightly above) 10,000,000 barrels. (CX0783) Both Tank 7515 and Tank 7513 at all times were among the tanks listed on Schedule F.

244.    Section II of the TLA provides that "The Tanks to be used by Customer shall be determined by [LBT] and notified to Customer," and that determination must be made by LBT's selection from among tanks that the Parties have agreed to list on Schedule F.  Unipec has the right, under the TLA, to "confirm" that it has received prior notice of the tanks selected and to "confirm" any increases in the capacity being leased above the levels to which Unipec previously agreed as the total was built to 10,000,000 barrels. LBT provided appropriate notice of Tank 7513's selection, which LBT was authorized by the TLA to make, on June 16, 2021. (CX0783)

245.    The addition of Tank 7513 to Unipec's leased tanks, bringing their number back to 21 tanks, brought the leased Tankage capacity for which Unipec was being charged to a level slightly above the contractual 10,000,000 limit. Unipec previously had accepted this slight deviation to a level above 10,000,000 barrels without objection. (Unipec Post-Hearing Br., para. 496; LBT Post-Hearing Reply Br., para. 485) The replacement tank designation merely returned the available capacity to the previously agreed limit. The TLA therefore did not require that Unipec "confirm" any increase in shell capacity under circumstances that might be envisaged by Section V.

246.    The second and third of Unipec's arguments concerning the Tank 7513 fees are insufficient for the reasons LBT advances, which are noted above.  Unipec's objection to Tank 7513 cannot properly be based on any known defect to its foundation, Unipec is not being charged for use of more tanks than those necessary to supply 10,000,000 barrels of capacity, and the TLA has not been terminated. Unipec therefore is required to pay Storage Fees that LBT has invoiced for that tank, as well.

247.    However, Unipec also asserts a defense based on mitigation. In April of 2020, Unipec proposed substituting Tanks 7411 and 7412 for Tanks 7403 and 7410, suggesting that LBT could lease those tanks to another customer on a one-year basis for fees much higher than Unipec's Storage Fees (arguably double), which Unipec now maintains would have mitigated LBT's damages by at least $6,200,000. (JX0089; LBT Post-Hearing Br., paras. 546-53) LBT rejected that proposal (though it did later lease Tanks 7411 and 7412 to Unipec, commencing in August of 2020, *see* LBT Post-Hearing Br., para. 553) LBT suggested instead that Unipec might exercise its right to sub-lease the two tanks to someone else, which Unipec rejected. (Tr. 911-17, 1015-19 (Neal))

248.   Alternatively, Unipec maintains that LBT could have simply removed Tanks 7403 and 7410 from the schedule of tanks leased to Unipec and leased them to another customer at higher fees, which would have had the effect of lowering the shell capacity made available to Unipec and reducing LBT's damages by the same amount, at least $6,200,000. LBT rejected that proposal, as well, even though LBT's Vice President of Commercial Development, Mr. Neal, testified that LBT had a potential customer available and could have re-leased those tanks for a one-year period beginning in July or August of 2020. (Tr. 1019) LBT took the position that it had the contractual right to act unilaterally to do precisely that, remove the tanks from Unipec's lease for a time and return them to Unipec's lease when it chose to do so (as LBT did with Tank 7513). (Tr. 1015 (Neal)) But LBT did not take that step for reasons that are vaguely stated but can be summarized as LBT's concerns with its various disputes with Unipec that were ripening in 2020. (Tr. 904-06, 1017-19 ("I think we talked about that at the time, that seemed to be potentially a little problematic.") (Neal))

249.   New York law includes the principle of mitigation, which requires a plaintiff in a breach of contract action to take reasonable action to mitigate damages it incurs. *Coastal Power Int'l, Ltd. v. Transcon. Cap. Corp.*, 10 F.Supp.2d 345, 370 (S.D.N.Y. 1998); *Wilmot v. State*, 32 N.Y. 2d 164, 168-69 (1973); *Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F.Supp.2d 230, 247 (S.D.N.Y. 2011); *APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir. 2010).

250.   The Tribunal concludes that Unipec is not entitled to a mitigation reduction or offset with respect to a possible substitution of Tanks 7411 and 7412 for Tanks 7403 and 7410, for which Unipec declined to pay Storage Fees. The TLA gives LBT, rather than Unipec, the right to determine which of the agreed Schedule F tanks are considered placed on the lease and designated to store Unipec's Product.  This mitigation argument seeks to assign to LBT a burden of showing that it was unreasonable for LBT not to honor Unipec's unilateral preference for some of those tanks over others, which implies a right contrary to what the TLA provides. LBT had commercial reasons to prefer not to make that substitution at the time when Unipec requested it, which was within LBT's rights.

251.   In contrast, the Tribunal concludes that LBT was correct in its judgment in 2020 that it was free to remove Tanks 7403 and 7410 from Unipec's lease, enter into a short-term lease with another customer and then add the tanks back to Unipec's lease later. This would have been consistent with LBT's exercise of its unilateral rights with respect to Tank 7513, and no sublease by Unipec would have been required. As noted, Mr. Neal testified that a specific customer was available to lease the tanks for one year beginning in August 2020.  LBT was charging Unipec Storage Fees for Tanks 7403 and 7410, thereby essentially vouching for their integrity and fitness, and it would have been entirely reasonable for LBT to lease the tanks to another customer, acting consistently with LBT's professed willingness to use them to store Unipec's Product. Unipec has met its burden of proof with regard to this mitigation defense.

252.   However, the amount that Unipec claims should be offset against its obligations as a result of this mitigation obligation, $12,889,000, is speculative.  The record does not reflect what the financial terms of a lease of the two tanks to an alternative customer for one year would have

been. The total of the Storage Fees that Unipec was required to pay for Tanks 7403 and 7410 for that year, and which it would not have paid had LBT mitigated its damages, is listed by Unipec as $6,467,000 (Post-Hearing Reply Br., App. J, scenario 0) LBT's claim for Storage Fees therefore should be reduced by $6,467,000 on the basis of Unipec's mitigation defense.

253.     Accordingly, LBT is entitled to recover from Unipec the amount of the Storage Fees LBT claims for the relevant periods for Tanks 7403, 7410, 7513 and 7515, subject to a deduction based on failure to mitigate, which is $20,367,070 ($26,834,070 less $6,467,000).

### 6.   The SPM delay penalty discount

254.     The First Amendment to the SPA in December 2016 established a deadline of December 31, 2018 for LBT to place the SPM system into service to receive crude oil from VLCC vessels. Section VII states that, if LBT missed that deadline, Unipec could elect to receive a monthly per-barrel discount against Storage Fees until the SPM system was placed into service. The discount was $0.02 per barrel starting on January 1, 2019 and escalating by another $0.02 each calendar quarter up to a maximum of $0.10 per barrel at the year's end.

255.     LBT finally commissioned the SPM and placed it into service on December 22, 2019. Unipec elected to claim its discount. Unipec now asserts that LBT's claim for the amount of the discount that Unipec withheld, $664,000 (Unipec Post-Hearing Br., App. G), should be denied.

256.     In its post-hearing briefing in response to Unipec's explanation of the basis for this claim to withhold payment, LBT conceded a reduction in fees claimed by LBT, but stated in a footnote that the reduction should be limited to only $404,352 (because that was the amount Unipec "originally sought" at some unspecified time) and Unipec should pay the difference. (Post-Hearing Reply Br., fn 747) In the absence of further justification for this difference in the amounts, Unipec's justification for its withholding of $664,000 should be accepted. LBT's claim with respect to the amount Unipec has withheld for this issue, $664,000, should be denied.

### 7.   The product transfer loss

257.     In May 2021 Unipec allowed LBT to use some of Unipec's crude oil in a line displacement operation for the benefit of another tenant, BP. LBT agreed to indemnify Unipec for any loss of Product incurred in the operation in excess of a 250-barrel threshold. (RX083)

258.     Unipec contends that approximately 5,400 barrels were lost during the operation because LBT removed about 19,000 barrels from Tank 7412 instead of the approximately 14,000 barrels intended, and only 14,801 barrels were received back into Tank 7514. Unipec claims a right to indemnity in the amount of $414,000 for lost crude oil plus $8,000 for freight cost due to seawater being loaded onto a receiving vessel in the operation, totaling $422,000. Unipec seeks to offset that amount against any Storage Fees that it might owe LBT.

259.     LBT contends that no loss actually occurred. (Neal 2d WS, para. 125) However, LBT admits that the independent inspector's report shows that 15,208.71 barrels were removed from Unipec's tank instead of the intended 14,250 barrels (RX0539), which would indicate a loss of approximately 950 barrels. (LBT Post-Hearing Reply Br., para. 501)

260.    LBT adds that 407 of the "lost" barrels remained in a Terminal pipeline set aside for Unipec's use, leaving an actual loss of only 543 barrels. LBT argues that deducting the 250-barrel threshold amount from 543 barrels leaves 293 barrels, which at a value of $76.67 per barrel would entitle Unipec to an offset of $22,463.33 rather than the claimed $414,000. (*Id.*, paras. 502-03)

261.    Unipec's calculation is based on tallies of barrels exiting a tank and returned to the tank, without taking account of product remaining in connecting pipelines and still owned by Unipec. LBT's calculation of the value of the loss if the inspector's report is used as a basis, as it should be, is $22,463.33, which therefore should be accepted. Unipec should pay LBT for the difference between that loss and the amount withheld in respect of it ($414,000), leaving a balance due LBT on this claim of $391,536.67.

### 8.   Four other claimed offsets

262.    In addition to these two offset claims, Unipec contends that any Storage Fees due to LBT should be subject to four additional reductions. (Unipec Post-Hearing Reply Br., paras. 339-57 and App. J)

263.    Unipec argues, first, that all of the 7400 and 7500 series tanks are under-designed and, as Dr. Guzey concluded, should not be filled beyond 50% of their capacity. Unipec maintains that only 50% of the capacity of the four disputed tanks therefore was actually "available" to Unipec and that the Storage Fees for those tanks claimed by LBT should be reduced in the amount of $13,417,000.

264.    Section V of the TLA, quoted above, provides that Storage Fees may not be charged "when any Tank(s) are being examined, repaired, or otherwise placed out of service by [LBT], or otherwise use of the Tank(s) has ceased other than where use has ceased due to actions of the Customer." Unipec's second argument is that repairs to Tanks 7403, 7410 and 7515 are still incomplete and that LBT cannot claim damages for certain periods during which LBT maintains they were ready to be returned to use. Unipec seeks reduction of Storage Fees for this reason in the amount of $6,983,000.

265.    Unipec requested that LBT swap Tanks 7403 and 7410, which Unipec considered to be in substandard condition, for Tanks 7411 and 7412, which Unipec was prepared to accept as replacements. LBT did so starting in August 2020.  Unipec's third offset is based on its argument that LBT was unreasonable in not accepting the proposed substitution earlier, as a result of which its claimed damages should be reduced by $6,200,000.

266.    LBT's response to these allegations is that (a) all tank foundations are safe; (b) Unipec cannot reduce its payment obligations by omitting periods when the tanks were undergoing "in-service" repairs; and (c) LBT was not required by contract to accept Unipec's request to swap tanks.

267.    Each of these offsets has been considered above in connection with Unipec's defenses to LBT claims, and each of them should be rejected.

268.   Unipec's fourth argument is that LBT should have mitigated any damages by leasing Tanks 7403 and 7410 to other customers during the 2020 contango period, which the Tribunal accepts, but only to the extent of $6,467,000, as discussed above.

>   9.   Interest

269.   Section 3.4 of Schedule A to the TLA, quoted above, provides that "Customer may withhold from any payment amounts disputed by Customer in good faith" and that, upon resolution of the dispute, "no interest will be paid on any amount deemed owed."

270.   LBT seeks simple interest on the amounts it claims as damages at the rate of 9%, relying in post-hearing briefing on a claim that Unipec withheld Storage Fees in bad faith. (Post-Hearing Br., para. 242, Post-Hearing Reply Br., paras. 504-09)  Unipec denies any bad faith and relies on the plain language of Section 3.4 of Schedule A as an exclusion of interest.

271.   The Tribunal concludes that Unipec has proceeded in good faith in asserting its claims in this arbitration and that no interest is due.

>   10.   Summary of Damages Computations

272.   In summary, LBT is entitled to recover $20,367,070 for unpaid Tank rental fees, plus $391,536.67 with respect to an amount withheld by Unipec in respect of a product transfer loss, resulting in a net amount of $20,758,606.67 due from Unipec to LBT.

**E.   Costs**

273.   Section R-47 of the Rules states, in pertinent part:

>   (c) In the final award, the arbitrator shall assess the fees, expenses and compensation provided in Sections R-53, R-54 and R-55.  The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

>   (d)  The award of the arbitrator(s) may include:

>>   i. interest at such rate and from such date as the arbitrator(s) deem appropriate; and

>>   ii.  an award of attorneys' fees if all parties have requested such an award or it is authorized by laws or their arbitration agreement.

274.   Although the Tribunal is authorized to award a party recovery of some or all of its attorneys' fees where, as here, both parties have requested such an award, neither the TLA nor the Rules require that the Tribunal do so.

275.   In the present case, the Tribunal considers that the Parties each should bear its own attorneys' fees. The claims of each Party have been asserted and pursued in good faith, in a matter involving important safety and financial interests that justified vigorous presentation.

Each has determined how and at what cost to assert its claims, and there is no reason to penalize either with payment of the other's attorneys' fees and related expert and other costs.

276.    The Tribunal considers that, in the exercise of its discretion under Section R-47, the fees, expenses and compensation of the arbitration provided for in R-53 (administrative fees), R-54 (travel and other arbitrator expenses) and R-55 (arbitrator compensation), on the other hand, which are smaller and more appropriately related to the result of the arbitration,  should be paid on the basis of the extent to which each party may be considered to have prevailed in the arbitration.

277.    LBT has prevailed in defeating Unipec's primary claim of a right to terminate the TLA and has prevailed substantially in its claims for unpaid storage fees. However, Unipec has prevailed to a substantial degree in its request for declaratory relief with respect to the applicable standard of care, which is relevant for the remaining term of the TLA, and in regard to certain of LBT's monetary claims.  As an exercise of discretion and without regard to any formula, the Tribunal concludes that the Section R-47(c) costs therefore should be allocated to be paid 75% by Unipec and 25% by LBT.

278.    Accordingly, the administrative fees and expenses of the ICDR totaling $46,408.14, and the compensation and expenses of the Arbitrators totaling $525,460.40, should be borne by Unipec in the amount of $428,901.40 and by LBT in the amount of $142,967.14.

## VIII.  AWARD

279.    WHEREFORE, for the reasons set forth above, the undersigned Arbitrators hereby DECLARE and AWARD as follows:

> (a)  Under the TLA, the Operator must aspire to meet the highest industry standards but, at a very minimum, must comply with standards equal to those of other comparable first-class operators of terminal facilities.

> (b) Unipec America Inc.'s request for a declaration that it may terminate the TLA is denied.

> (c)  Under the TLA, Limetree Bay Terminals, LLC has the exclusive, unilateral right to determine which tanks shown on Schedule F, as it may be amended from time-to-time by the agreement of the Parties, shall be utilized for the storage of Product owned by Unipec America, Inc., and LBT must give Unipec America, Inc. advance notice of such determination with respect to each cargo of Product delivered to the Terminal. However, once initially stored, Limetree Bay Terminals, LLC may not then move or transfer Unipec America, Inc.'s stored Product to any other tank, whether it is on Schedule F or otherwise, without Unipec America, Inc.'s prior consent.

> (d)  Unipec America, Inc. has breached the TLA by failing to pay Storage Fees due to Limetree Bay Terminals, LLC in the amount of $20,758,606.67 and must pay to Limetree Bay Terminals, LLC the sum of $20,758,606.67 within 30 days from transmittal of this Final Award to the Parties.

(e)  The administrative fees and expenses of the ICDR totaling $46,408.14, and the compensation and expenses of the Arbitrators totaling $525,460.40, shall be borne by Unipec America, Inc. in the amount of $428,901.40 (75% of the total of these costs) and by Limetree Bay Terminals, LLC in the amount of $142,967.14 (25% of the total of these costs). Therefore, Unipec America, Inc. shall reimburse Limetree Bay Terminals, LLC the sum of $153,296.23, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Limetree Bay Terminals, LLC upon demonstration by Limetree Bay Terminals, LLC that these incurred costs have been paid.

(f)  All other claims and counterclaims are denied. This Final Award is in full settlement of all claims and counterclaims submitted in this arbitration.

280.  This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

Dated: New York, NY
       September 14, 2022

_____
James H. Carter, Arbitrator

I, James H. Carter, do herby affirm upon my oath as an arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

James H. Carter

Dated: September 14, 2022

50

_____
James M. Hosking, Arbitrator

I, James M. Hosking, do hereby affirm upon my oath as an arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

_____
James M. Hosking

Dated: September 13, 2022

_____
Diana E. Marshall, Arbitrator

I, Diana E. Marshall, do hereby affirm upon my oath as an arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

_____
Diana E. Marshall

Dated: September     , 2022

51

_____
James M. Hosking, Arbitrator

I, James M. Hosking, do hereby affirm upon my oath as an arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

_____
James M. Hosking

Dated: September /4 2022

_____
Diana E. Marshall, Arbitrator

I, Diana E. Marshall, do hereby affirm upon my oath as an arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

_____
Diana E. Marshall

Dated: September /4 2022

51

STATE OF TEXAS )
                ) SS:
COUNTY OF HARRIS )

I, Diana E. Marshall, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, with is our Final Award.

_____
Diana E. Marshall, Arbitrator

STATE OF TEXAS )
                ) SS:
COUNTY OF HARRIS )

On this 14th day of September, 2022, before me personally came and appeared Diana E. Marshall, to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that she executed the same.

_____

BARBARA MABRY POWDERLY
Notary ID #128992269
My Commission Expires
May 17, 2024

53